914 F.2d 260
 Unpublished Disposition
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Alice E. NEECE, John D. Neece, and Beverly J. Grant, as
Independent Co-Administrators of the Will annexed
of the Estate of Delbert M. Neece,
Deceased, Plaintiffs-Appellants,
v.
JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Michael J.
Sekara, CLU General Agency and Raymond E. Jones,
Defendants-Appellees.
 No. 89-1729.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 20, 1990.
Decided Sept. 20, 1990.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division, No. 86-C-7572, Suzanne B. Conlon, Judge.
 
 
 1
 N.D.Ill.
 
 
 2
 AFFIRMED.
 
 
 3
 Before COFFEY, and RIPPLE, Circuit Judges, and REYNOLDS, District Judge.*
 
 ORDER
 
 4
 Alice E. Neece and the other co-administrators of the estate of her deceased husband, Delbert M. Neece, appeal the district court's grant of summary judgment for defendant John Hancock Mutual Life Insurance Company on their claims that Hancock breached its contractual obligation to the Neeces under the terms of one insurance policy and ratified the fraud of its agent as to two other policies. For the following reasons, we affirm the judgment of the district court.
 
 
 5
 * BACKGROUND
 
 A. Facts
 1. The $100,000 policy
 
 6
 On February 4, 1983, Hancock issued a life insurance policy to Delbert Neece on his own life with a face value of $100,000. Raymond E. Jones, a Hancock sales representative, sold the policy to Mr. Neece. The annual premium on this policy was $11,228.25. The Neeces claim that Jones represented to them that the premiums were to be paid for only four years. The policy included a nonforfeiture option, meaning that if Mr. Neece ever defaulted on premium payments, the policy would lapse and Hancock's liability would be limited to the reduced paid-up value of the policy plus interest.
 
 
 7
 The payments on the $100,000 policy were made through a mix of cash payments and loans against the cash value of the policy. Although the parties seem to disagree as to the exact value of the payments made, both parties agree that the Neeces made at least three cash payments on the policy through January 1985. According to Hancock, the policy lapsed on September 4, 1985, when the cash value of the policy became insufficient to support further loans to make the premium payments. Under the terms of the nonforfeiture provision, however, the lapsed policy continued in force as reduced paid-up insurance in the amount of $1,190.00. On November 13, 1985, Hancock mailed Mr. Neece a notice stating that the policy had lapsed.
 
 
 8
 The Neeces contend that, on March 5, 1986, Jones visited their residence and picked up a check payable to Hancock in the amount of $2,866.65.[1] The Neeces characterize this payment as the "final payment" on the policy; however, the check was accompanied by an application for reinstatement bearing the purported signature of Delbert Neece. Although a Hancock refund slip dated March 6, 1986 directed that a check be drawn to Delbert Neece for "overp[ai]d reinstatement cost," R. 224 Ex. 14, other uncontroverted evidence reveals that Hancock issued a refund check in the amount of $2,866.65 to the Neeces. There is no evidence that Hancock actually reinstated the policy.
 
 2. The $500,000 policies
 
 9
 On April 20, 1984, about one year after Jones had sold Mr. Neece the $100,000 policy, Hancock issued two separate $500,000 policies: one to Mr. Neece on the life of Mrs. Neece (Mr. Neece's policy) and one to Mrs. Neece on the life of Mr. Neece (Mrs. Neece's policy). Jones sold these policies to the Neeces after allegedly representing to them that they could purchase both policies by paying a total of $106,000 in premiums and that no further premium payments would be required after the first year. The policies themselves, however, explicitly provided that annual premiums were due for a period of twenty-five. Both policies also contained provisions expressly stating that the agent had no authority to waive or change any of the conditions in the policy agreement.
 
 
 10
 The Neeces noted the discrepancy between Jones' representations and the policy agreements and questioned Jones about the discrepancy. Jones, however, assured them that only one premium payment was required. Based on this representation, the Neeces paid approximately $65,061 on Mrs. Neece's policy and $45,377 on Mr. Neece's policy over a period of eleven months. The amount paid on the policies was roughly equivalent to one years' premium as provided in the policy agreements. After making these payments through March 1985, the Neeces assumed that they had made all the required payments on the policies. However, in April 1985, the Neeces received notices from Hancock informing them that additional premiums were due on the policies. The Neeces then contacted Michael Sekara, manager of the general agency where Jones worked and Jones' immediate supervisor. Sekara told the Neeces to contact Jones. Jones allegedly advised the Neeces that the policies were still in effect and that they should disregard the notices from Hancock.
 
 
 11
 On October 22, 1985, Hancock notified Mrs. Neece that her policy had been terminated because of her failure to make further premium payments. The Neeces again contacted Jones, who allegedly told them to ignore this notice. On December 27, 1985, Hancock notified Mr. Neece that his policy was in default and had been converted to a paid-up value of $704.00. On or about February 19, 1986, the Neeces, with the assistance of their daughter Joan Christianson and her employer, Joseph Powers (himself an insurance agent), contacted Hancock's home office in Boston and reported Jones' alleged misrepresentations to Mr. Thomas Norton. Pursuant to Norton's request, the Neeces sent a follow-up letter a few days after the phone conversation. Upon receiving this information, Norton initiated an investigation of the Neeces' complaint.
 
 
 12
 John F. Gallagher from Hancock's home office investigated the Neece complaint. When the Neeces told him that Jones had represented to them that they could receive $1,100,000 worth of insurance coverage for $130,000, Gallagher told them that these representations by Jones were completely incorrect. The Neeces threatened litigation if they did not get the $1,100,000 in paid-up coverage as represented by Jones. Hancock refused this demand. On June 2, 1986, in response to inquiries from the Neeces' attorney, regarding the statements of the investigation, Norton sent a letter to the Neeces' attorney that stated, in pertinent part:
 
 
 13
 After thoroughly evaluating all the available facts, we do not find any substantive evidence that the terms and conditions of the subject policy, or the basis under which it was to be paid, were misrepresented by Raymond Jones.
 
 
 14
 While the John Hancock is always concerned whenever a policyholder is dissatisfied with his or her insurance policy, it is the Company's position that ... valid insurance contracts were in effect and the Company incurred an obligation to consider a claim had one been presented. Accordingly, we cannot comply with your request for issuance of fully-up policies on the lives of Delbert and Alice Neece.
 
 
 15
 R. 337 Ex. 24.
 
 B. Litigation
 
 16
 The Neeces sued Hancock in Illinois state court. Hancock had the case removed to federal district court in October 1986. Delbert Neece died on November 23, 1986. Mrs. Neece and the co-administrators of Delbert Neece's estate filed an amended complaint alleging, inter alia, that Hancock had ratified Jones' misrepresentations regarding the two $500,000 policies and was liable for fraud, negligent misrepresentation, and violations of the Illinois Consumer Fraud Act. The Neeces sought punitive damages and reformation of the two policies to conform to Jones' representations. The Neeces also asserted a breach of contract claim against Hancock based on the $100,000 policy. This claim sought recovery of the full death benefits under the $100,000 policy.
 
 
 17
 The claims against both Jones and Sekara were settled prior to trial. After discovery was completed, Hancock moved for summary judgment on the Neece's contract claim against it based on the $100,000 policy and the reformation, fraud, and state consumer fraud claims based on the two $500,000 policies.
 
 C. District Court Opinion
 
 18
 The district court granted Hancock's motion for summary judgment. Regarding the $100,000 policy, the court noted that the Neeces did not dispute the fact that Mr. Neece failed to make premium payments after September 4, 1985, and that, under the terms of the policy, annual payments of $11,228.25 were required. The court then observed that, because this claim was a breach of contract claim rather than a fraud or negligent misrepresentation claim, the Neeces could not escape the fact that the insurance contract itself limited Hancock's liability to the paid-up value of the policy. Upon concluding that there were no remaining material facts in dispute, the court granted summary judgment for Hancock as to the Neece's contract claim on the $100,000 policy.[2]
 
 
 19
 The district court also concluded that, as a matter of law, Hancock could not be held to have ratified Jones' alleged fraud regarding the two $500,000 policies. First, the court noted that, in order for a principal to ratify an agent's fraud, the principal must be aware of the material facts regarding the unauthorized transaction. The court found that "it is undisputed that Hancock's corporate headquarters first learned of Jones' alleged fraud on March 6, 1986, well after Hancock terminated [Mr. Neece's policy] and after it changed the status of [Mrs. Neece's policy]." Memorandum Opinion, No. 86 C 7572 at 8 (N.D.Ill. February 21, 1989). Although the court acknowledged the Neeces' argument that Hancock should be charged with notice of the fraud at the time the Neeces contacted Sekara, the district court rejected this argument under the principle that an agent's knowledge cannot be imputed to a principal "when the agent allegedly is engaged in the fraud and has a motive for concealing the fraud." Id. at 9. The court further noted that Hancock's conduct during the transactions did not support the claim that it ratified Jones' acts. Hancock, upon learning of the fraud, had "acted swiftly and decisively to disavow [Jones'] alleged misrepresentations." Id.
 
 
 20
 The court also rejected the argument that Hancock had ratified Jones' fraud by retaining the benefits of the alleged fraud. Applying the test set forth in Corn Belt Bank v. Lincoln Sav. & Loan Ass'n, 456 N.E.2d 150 (Ill.App.Ct.1983), the court concluded that Hancock did not have knowledge of all the material facts. Moreover, the court noted that Hancock was not required to refund the premiums paid during the two years that the $500,000 policies remained in force because these premiums compensated Hancock for the risk it incurred during the time that the policies were in force. Finally, the court noted that nothing in the record suggested that the Neeces had detrimentally relied on Hancock. Because the terms of the policy agreements expressly stated that agents do not have the authority to waive or vary the terms and conditions of the policies, the Neeces were placed on notice that the terms represented to them by Jones could not control to the extent that those terms differed from those in the policies.
 
 
 21
 The district court similarly denied the plaintiffs' posttrial motion to alter or amend the judgment. This motion was based, in part, on the plaintiffs' claim of "newly discovered evidence." This evidence included an October 1984 Hancock internal memorandum drafted by Hancock employee Joseph Catherine, in which Catherine stated that he had received information from an unidentified source that Jones had been accused by several customers of misrepresenting the terms of policies. Although the Neeces contended that this memorandum placed Hancock on notice of Jones' purported misdeeds as early as October 1984, the district court rejected their attempted reliance on the memorandum on the ground that the letter was inadmissible hearsay. The court also rejected the Neeces' remaining contentions and denied the posttrial motion. The Neeces now appeal the district court's grant of summary judgment and its denial of the motion to alter or amend the judgment.
 
 II
 ANALYSIS
 A. Standard of Review
 
 22
 Our review of a district court's grant of summary judgment is de novo. Wolf v. Larson, 897 F.2d 1409, 1411 (7th Cir.1990). We must " 'decide whether the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to the judgment as a matter of law.' " Id. (quoting Wolf v. City of Fitchburg, 870 F.2d 1327, 1329 (7th Cir.1989) (quoting Colan v. Cutler-Hammer, Inc., 812 F.2d 357, 360 (7th Cir.), cert. denied, 484 U.S. 820 (1987))). A motion for summary judgment is not an appropriate occasion for weighing the evidence; rather, the inquiry is limited to determining if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In undertaking our review of a grant of summary judgment, we "must view the record and all inferences drawn from it in the light most favorable to the party opposing the motion." Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir.1989). However, a genuine dispute on a material issue is not raised unless there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).
 
 B. The $100,000 Policy
 
 23
 The Neeces contend they have raised a genuine issue of material fact on whether the $100,000 policy remained in force on the date of Mr. Neece's death. They contend that the issue of material fact has been created by their evidence that, on March 5, 1986, they gave Mr. Jones a check for $2,866.65. Whether this check is considered a "final payment" or a reinstatement is immaterial, contend the Neeces, because under either view the policy was in force on the date of Mr. Neece's death.
 
 
 24
 The essence of Hancock's argument on this point is that the factual issues raised by the Neeces are immaterial to a breach of contract claim. Under the terms of the contract, Hancock argues, the policy lapsed for failure to make the premium payments. Moreover, the Neeces never raised any theory of reinstatement in their pleadings. Finally, Hancock notes that the $2,866.65 payment was refunded to the Neeces. Thus, Hancock asserts, the Neeces' reinstatement argument is insufficient to defeat a motion for summary judgment because it is based on pure speculation.
 
 
 25
 We agree with Hancock's contention that, under the terms of the insurance contract, the policy lapsed on September 4, 1985, when the cash value of the policy became insufficient to support further loans with which to pay the premiums. At that point, under the terms of the contract, the policy lapsed and Hancock became obligated to pay only the paid-up cash value of the policy in the event of Mr. Neece's death. If, however, there was a genuine issue of material fact regarding whether the policy was reinstated (and thus, whether the policy was in effect on the date of Mr. Neece's death), such a genuine issue would preclude summary judgment on the contract claim.
 
 
 26
 After examining the record, we conclude that the Neeces have not raised a genuine issue of material fact regarding whether the policy was reinstated. The payment of $2,866.65 was refunded to the Neeces on May 2, 1986, well before Mr. Neece's death.[3] The Neeces contend that they received no notice of any kind regarding the $100,000 policy from March 6, 1986 to November 23, 1986, the date of Mr. Neece's death. Even assuming this were true, lack of notice from Hancock does not establish that the policy was reinstated. In fact, under the express terms of the reinstatement application bearing Delbert Neece's signature, the "application shall be deemed to have been declined if it has not been approved by the Company within 20 days from its date and the amount paid to effect reinstatement shall be returned." R. 224 Ex. 13. Thus, even under the Neeces' characterization of the facts, the contract was not reinstated and, therefore, was not in force when Mr. Neece died.
 
 
 27
 The essence of the Neeces' argument is that they had an enforceable insurance contract with Hancock based on the terms as represented to them by Jones. However, Jones' representations could bind Hancock only if Jones was acting within the scope of his actual or apparent authority when he described the terms of the policy to the Neeces. See Armstrong v. United Ins. Co. of Am., 424 N.E.2d 1216, 1225 (Ill.App.Ct.1981); see also Bank of Waukegan v. Epilepsy Found. of Am., 516 N.E.2d 1337, 1339 (Ill.App.Ct.1987). Jones certainly was not acting within the scope of his actual authority when he allegedly represented to Mr. Neece that only four payments were required on the policy. The policy itself stated that annual premiums of $11,228.25 were payable until Mr. Neece (who was 72 years old at the time the policy was issued) reached 95 years of age. R. 186 Ex. 12. Moreover, the policy itself stated that "[o]nly the President, Vice President, the Secretary, or an Assistant Secretary of the Company has authority to waive or agree to change in any respect any of the conditions of provisions of the policy." R. 186 Ex. 13, p 17. Nor have the Neeces adduced any evidence to suggest that Jones' representations were within the scope of his apparent authority. "Apparent authority must be traced to some word or act of the alleged principal." Bank of Waukegan, 516 N.E.2d at 1340. The Neeces have submitted no evidence of any word or act of Hancock's by which it held Jones out as having authority to alter the terms of the policy. Thus, we conclude that the district court's grant of summary judgment for Hancock on this issue was appropriate.
 
 C. The $500,000 Policies
 
 28
 The only theory under which the Neeces seek recovery regarding the $500,000 is ratification. Thus, we shall uphold the district court's grant of summary judgment unless there exists a genuine issue of material fact on whether Hancock ratified Jones' alleged fraud regarding the $500,000 policies. Accordingly, the only facts that are material to our inquiry are those which would create a dispositive issue of fact under one of the theories of ratification recognized under Illinois law.
 
 
 29
 Under Illinois law, ratification may be express or implied. See, e.g., Mateyka v. Schroeder, 504 N.E.2d 1289, 1297 (Ill.App.Ct.1987). Express ratification occurs when a principal, with knowledge of all the material facts of the unauthorized transaction, expressly evidences an intent to be bound by the transaction. See id.; Peskin v. Deutsch, 479 N.E.2d 1034, 1039 (Ill.App.Ct.1985).
 
 1. Express ratification
 
 30
 The Neeces only hope of making out a claim of express ratification is their reliance on the June 2, 1986 statement in Norton's letter that the investigation had revealed no substantive evidence that Jones misrepresented the terms and conditions of the policy. However, this statement clearly did not evidence an intent to be bound to the specific terms and conditions that the Neeces alleged had been represented to them by Jones. In fact, the same letter expressly rejected the Neeces' attorney's demand to reinstate the policies on the terms Jones allegedly represented to the Neeces. Thus, the Norton letter cannot be viewed as an express ratification of Jones' alleged misrepresenations.
 
 2. Implied ratification
 
 31
 a. Acts inconsistent with nonaffirmation
 
 
 32
 Ratification also may be implied when a principal, with full knowledge of all material facts surrounding the transaction, takes a position inconsistent with nonaffirmation of the transaction. See, e.g., Mateyka v. Schroeder, 504 N.E.2d 1289, 1297 (Ill.App.Ct.1987). However, this theory of ratification is available only to an innocent third party who has relied upon the transaction to his detriment.[4] See Harris Trust & Sav. Bank v. Joanna-W. Mills Co., 368 N.E.2d 629, 637 (Ill.App.Ct.1977); see also Evanston Bank v. Conticommodity Servs., Inc., 623 F.Supp. 1014, 1034, 1037 (N.D.Ill.1985).
 
 
 33
 The first hurdle for the Neeces here is establishing that there was a genuine issue of material fact regarding whether Hancock had knowledge of all material facts regarding the Jones' alleged misrepresentations. On appeal, the Neeces contend that the critical date on which Hancock had complete knowledge of all the facts was June 2, 1986, when Norton wrote his letter to the Neeces' attorney. Thus, under this theory, Hancock could not have impliedly ratified Jones' conduct until the June 2, 1986 Norton letter.
 
 
 34
 The Neeces contend that the Norton letter at least raises a factual question regarding Hancock's ratification. We still cannot conclude, however, that the Norton letter constitutes the taking of "a position which is inconsistent with non-affirmance of the transaction." Mateyka, 504 N.E.2d at 1297. "Ratification will not be implied from a principal's ... acts or conduct which are as consistent with an intention not to ratify as to ratify." Arthur Rubloff & Co. v. Drovers Nat'l Bank of Chicago, 400 N.E.2d 614, 618 (Ill.App.Ct.1980). Here, while Norton's statement may have indicated Hancock's concerns as to which party was misrepresenting the facts (either Jones or the Neeces), the statement simply cannot be read as a ratification of any misrepresentation by Jones. Indeed, the letter's rejection of the Neeces' demand for paid-up policies under the terms as allegedly represented to them by Jones states a position inconsistent with ratification of the alleged transaction between Jones and the Neeces.
 
 
 35
 b. Retention of benefits
 
 
 36
 Implied ratification also may occur if the principal retains the benefits of the alleged fraud. The parties agree that the test under this theory of ratification is set forth in Corn Belt Bank v. Lincoln Sav. & Loan Ass'n, 456 N.E.2d 150, 159 (Ill.App.Ct.1983). Under this theory, even if a principal purportedly has repudiated acts allegedly done on his behalf, he will be deemed to have ratified the transaction if he accepts the benefits of the transaction and does not return them within a reasonable period of time. However, a principal's retention of benefits even after learning of the breach will not amount to ratification if, through no fault of the principal, " 'conditions are such that [the principal] cannot be placed in status quo or repudiate the entire transaction without loss.' " Id. (quoting 3 Am.Jur.2d Agency Sec. 177 (1962)).
 
 
 37
 Hancock maintains that it was entitled to keep the premiums paid by the Neeces on the policies because it bore the risk of paying on the policies during the time the policies were in force. The Neeces do not really dispute Hancock's contention that the policies lapsed as a result of their failure to pay premiums; rather, the Neeces argue that this issue is irrelevant to their fraud claim because the law does not require that the contract they sue on be executory. However, by the time Hancock even arguably learned of all the facts surrounding the transaction, it had incurred the risk of insuring the Neeces for approximately a year and a half. The Neeces do not suggest how Hancock, after learning all the pertinent facts, could have repudiated the policies and still have placed itself in the position it was in before it incurred the risk of insuring the Neeces' lives. Cf. Corn Belt Bank, 456 N.E.2d at 160 (party asserting ratification by retention of benefits based on receipt of proceeds of loan guaranties made no showing as to how the principal could have repudiated the benefits and still have restored the status quo ). Moreover, when Hancock informed the Neeces that one of the policies had been cancelled and that the other had been reduced to a paid-up sum of $704.00 because the cash values of the policies could support no more loans with which to make premium payments, the Neeces demanded two fully paid-up policies in the face amount of $500,000 each. Mrs. Neece testified that she never asked anyone at Hancock for a refund of the premiums and Mr. Neece affirmatively stated that the Neeces did not want a refund of their premiums, but instead wanted full paid-up insurance. Given this evidence, the fact that Hancock did not make a formal tender of the premiums to the Neeces is not significant. See Builder's Concrete, Etc. v. Fred Faubel & Sons, 373 N.E.2d 863, 869 (Ill.App.Ct.1978) (it is a basic legal tenet that "the law never requires a useless act"); cf. Wing v. Lederer, 222 N.E.2d 535, 538 (Ill.App.Ct.1966) ("ratification rests on intention," and mere retention of benefits cannot constitute ratification where the principal does not have the choice of repudiating). In any event, as we have noted, by the time Hancock learned of the alleged fraud, there was very little "benefit" in the policies that could have been returned to the Neeces without leaving Hancock uncompensated for the risk of loss it had incurred under the policies. For these reasons, we conclude that the district court properly concluded that Hancock, as a matter of law, did not ratify the alleged fraud by retention of benefits.
 
 D. Exclusion of the "Catherine" Memorandum
 
 38
 In their motion for reconsideration, the Neeces offered a 1984 memorandum written by Hancock employee Joseph D. Catherine, which summarized a discussion with an unnamed source in Hancock's Columbus General Agency. That source presumably told Catherine that several customers had accused Jones of misrepresenting the terms of insurance policies. The district court excluded this memorandum as hearsay. Hancock argues that these arguments about prior complaints against Jones were raised for the first time in their motion to reconsider, and therefore should be waived. The district court noted that the plaintiffs had brought this evidence to the court's attention before, but presumably had done so in the context of their claims against Jones and Sekara. Even assuming that the Neeces have not waived the opportunity to offer this evidence, this evidence would not be admissible to assist the Neeces in withstanding summary judgment on the issue whether Hancock ratified the specific acts of Jones in question. The contents of the letter clearly were hearsay information; moreover, the letter did not identify any individuals that Jones allegedly had defrauded. The district court did not abuse its discretion in excluding this evidence.
 
 Conclusion
 
 39
 For the foregoing reasons, the district court's grant of summary judgment in favor of Hancock is affirmed.
 
 
 40
 AFFIRMED.
 
 
 
 *
 The Honorable John W. Reynolds, of the Eastern District of Milwaukee, Wisconsin, sitting by designation
 
 
 [1]
 There is some dispute among the parties regarding the purpose of this payment. The Neeces contend that this payment was intended as a "final payment" on the $100,000 policy or, alternatively, a payment to "reinstate" the $100,000 policy. Hancock, on the other hand, contends that this payment was taken by Jones as a deposit on a separate $400,000 policy that Jones attempted to sell Mrs. Neece. Whatever the purpose of this payment, it is undisputed that the payment was refunded to the Neeces
 
 
 [2]
 The district court did not address the Neece's argument regarding the alleged March 6, 1986, "final payment" of $2,866.55
 
 
 [3]
 The letter from Hancock to the Neeces characterizes this $2866.65 check as a return on a deposit the $400,000 policy. Whether this check is characterized as an attempted reinstatement of the $100,000 policy or an attempted deposit on a $400,000 policy, the result is the same for purposes of the claim based on the $100,000 policy: that policy never was reinstated
 
 
 [4]
 The requirement of detrimental reliance renders superfluous the Neeces' contention that Hancock's ratification of the transactions involving the two $500,000 policies can be predicated upon its alleged attempt (through Jones) to sell Mrs. Neece a new $400,000 policy to "possibly smooth the waters" of controversy related to the two $500,000 policies. Appellant's Br. at 19. Because it is uncontroverted that any deposit made on the $400,000 policy was refunded to the Neeces, the Neeces can assert no detrimental reliance upon which to base a claim for ratification