PROGRESS PRINTING CORPORATION, Plaintiff-Appellee, v. JANE BYRNE POLITICAL COMMITTEE *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 1—90—2310

Opinion filed September 15, 1992.

James H. Wolf & Associates, Ltd., of Chicago (James H. Wolf, of counsel), for appellants.

Johnson, Westra, Whittaker & Austin, of Carol Stream (Timothy B. Newitt, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

In 1982-83, defendant Jane Byrne (the candidate), then mayor of Chicago, ran unsuccessfully in the Democratic mayoral primary election. Plaintiff Progress Printing Corporation (Progress) produced brochures and other materials for the campaign. Two years later, Progress filed this suit against the Jane Byrne Political Committee (the Committee) and the candidate (collectively, defendants), alleging joint and several liability for approximately $91,000 in unpaid campaign printing bills. Progress prevailed in the subsequent bench trial. On appeal, defendants contend that (1) the circuit court abused its discretion in ruling that documentation of the unpaid orders was admissible as evidence; (2) the court's finding that the orders had been authorized or ratified was against the manifest weight of the evidence; and (3) the court erred as a matter of both fact and law in holding the candidate herself liable. We affirm the judgment of the circuit court as to liability, but we remand for entry of an order with a lesser judgment amount.

Progress originally brought suit against only the Committee and the candidate. To the complaint were attached invoices, purchase orders, delivery forms, and other documentation of orders for stationery, brochures, bumper stickers, posters, reception invitations, and the like. Progress alleged that defendants had authorized or ratified the

orders or, alternatively, that it was entitled to recover under the theory of *quantum meruit*. Because the Committee was an unincorporated association with no identity separate from the candidate herself, Progress contended, she could be held personally liable for the debts. Progress later amended its complaint to add another defendant, Brady Griffin & Associates (Brady), a partner in which, William Griffin, had worked in the candidate's campaign. Brady's defense was that as an agent of a disclosed principal, it could not be held directly liable. Defendants denied that they had authorized or ratified the printing, that Brady was their agent, and that the work represented in the bills had been performed.

At trial, Stanley Gapshis (Stanley), chairman of Progress, testified that he met the candidate in front of her office at City Hall in November 1982, at which time she told him "you will have my campaign. *** Mr. Griffin will get in touch with you." Shortly thereafter, Griffin called Stanley and said "you have the Byrne campaign" and "you will get your copy from [Mary Elizabeth] Pitz." One week later, Stanley went to Pitz's office at her request. There, Pitz told him she would be "handling all the artwork and copy for the campaign." During the campaign, the general practice was that someone from Progress would pick up the artwork from Pitz along with a purchase order. Progress then would produce the order and deliver it to one of the campaign headquarters or a campaign worker would pick it up. Shortly after completion of each printing job, Progress prepared an invoice, which described the items printed and the quantity; these invoices were sent to Brady on Pitz's instructions. Stanley later conceded, however, that at his deposition, he had described his initial conversation with the candidate as having occurred during a telephone call and that he could not remember who had told him to bill Brady for the work.

According to Stanley, the candidate called him in November 1983, nine months after the election, to say that she was sending a check for $10,000 and would have more later. She made no objection, at that time or before, to the quality or quantity of the work, nor had anyone else rejected any of the printed matter. On examination by Brady's counsel, Stanley stated that all the orders had been for the campaign and that any checks Progress had received in payment were from the Committee, not Brady. At this point, the court inquired why Brady had been named as a defendant in the case. Upon learning that the only reason was defendants' claim that Brady was not their agent, the court dismissed Brady as a party.

After Stanley described the purchase orders, invoices, and job tickets[1] for the paid orders (exhibits 1 through 27) as records made and kept in the ordinary course of Progress' business and kept in his custody, Progress tendered them as evidence. Defendants objected, asking the court to reserve its ruling until the close of Progress' case, and the court agreed. Stanley described the documents for the contested orders (exhibits 28 through 57) in the same way. Defendants again objected, and the court again reserved ruling.

On cross-examination, Stanley admitted that other than Pitz, neither Griffin nor the candidate had even mentioned the names of the people who had ordered materials, much less told him that they were authorized to do so. Stanley was unable to identify who had placed some orders or who had taken delivery of others because a number of the orders at issue had incomplete job tickets or were lacking purchase orders or delivery forms. He agreed that two types of handwriting appeared on some of the job tickets, indicating subsequent changes, and he acknowledged that some of the materials bore names in addition to the candidate's, urged voters to "Punch 10" without mentioning the candidate's name, or had been printed in red or blue rather than green, the signature color of the candidate's campaign. On redirect examination, he noted that some of the invoices for red materials were specifically paid for with Committee checks, and that these items were an exception to the usual color because they were intended for Hispanic neighborhoods. He explained that "Punch 10" was a reference to the way in which one could cast a ballot for the entire Democratic ticket rather than vote for the candidates individually, and he also agreed that he had performed printing services for other customers during the campaign, including the Cook County Democratic Party.

Griffin testified next. His firm had been hired for the campaign and he served as the candidate's campaign coordinator, the liaison between the candidate's campaign organization and her mayoral staff. Although he recalled telling Pitz to send printing orders to Progress, he did not remember whether he had mentioned Pitz to Stanley. He had told Stanley that Progress was the printer for the campaign and, in a later telephone call, had said "[j]ust send [the bills] to my office, and I will walk them over and get them paid for you." On receiving

---

[1]Stanley explained that a "job ticket" contains the following information: the orderer's name; the billing; the quantity of items along with a description of the size, typeface, and color; the person who accepted delivery or picked up the order; and the location of delivery or pickup.

the invoices, he took them to the campaign office and gave them to his mother, Eleanor Griffin, who was responsible for the campaign's financial reporting and who worked with the accountants; he himself never paid them. During cross-examination, Griffin said he merely delivered the invoices; he never checked to see that the work had been authorized or performed. He did not recall authorizing the use of colors other than green and white, nor did he remember anyone else giving such authorization. He recognized some of the names of those who placed the disputed orders as people who worked in the candidate's campaign, including Carl Bator, a city worker who took time off to run the main campaign headquarters, and a number of people who worked for Al Ronan, a campaign consultant. He also admitted that the campaign had used the slogan "Punch 10" and a letter from Richard Ogilvie supporting the candidate in the election.

Progress then called the candidate as a hostile witness. She agreed that Griffin was a campaign assistant but replied "not to my knowledge" when asked if she had retained Brady, his firm. She admitted that only she signed Committee checks and that Eleanor Griffin processed all the bills for the campaign.

Martin Gapshis (Martin) testified that he was the person at Progress responsible for the campaign printing account, processing orders and overseeing their production. He had received no complaints whatsoever about lack of authorization for any orders. He also related a conversation that occurred during an accidental meeting with the candidate during the campaign in which she had thanked him for the speed with which Progress had produced one of the orders at issue and for its services generally; she had uttered no complaint about any work by Progress. He described fruitless attempts, in the form of letters to the candidate after the election, to collect the balance due on the account, and a call from the candidate's attorney, who told him that he hoped that Progress would be paid shortly because fund-raisers had been planned and paying Progress was a priority. Martin also described a conversation with the candidate at a chance meeting in September 1984, 19 months after the election, in which she told him that she was having a fund-raiser and that she "hoped to be able to get [Progress] the money very soon." On cross-examination, he admitted that during the campaign he sent no invoices directly to the candidate or the Committee.

Progress then called Pitz, who owned an advertising agency hired for the campaign. She described the meeting in which Griffin asked if she was interested in the campaign print work, her introduction to the candidate the next day, and her first meeting with the candidate

and the campaign staff. Griffin asked her to consider Progress as the printer, and she chose Progress after Stanley called and then gave a presentation at her office. Griffin told her she had authority to order printed material from Progress but not from any other printer. As for the information she needed to include in the campaign literature, she stated that "[a]ll of [her] direction came from Bill Griffin"; he told her whether the copy was accepted and obtained approval of layout and final artwork. Like Progress, she submitted her invoices to Griffin and was paid with Committee checks; like Progress, she had not been fully reimbursed. She attended a "couple dozen" meetings in the candidate's presence. According to Pitz, the candidate had not expressed dissatisfaction with her work nor fired her during the campaign. Some of the campaign literature was red rather than green, she explained, because the candidate, Griffin, and others decided that certain campaign literature would be red as a tie-in with the Northwest Hispanic Democratic Coalition, which used red in its own materials; Tony Roque was Pitz's main contact for this aspect of the campaign.

Delores Seweryn, Progress' bookkeeper, explained that generally payments are applied to the oldest outstanding bills unless accompanied by invoices. Only the first few Committee payments were earmarked for particular invoices; later Committee checks were lump sum payments. She too described collection attempts, including September 1983 instructions from Eleanor Griffin to send the bills to the office of Stanley Kusper. Catherine Waner, an employee of the printing trade association, described her own efforts to help Progress collect on the account: the candidate's attorney asked Waner for documentation, but after she sent copies of the invoices she received no response.

Tony Roque, Progress' final witness, organized Hispanic voting efforts for the campaign. He stated that Ed Vrdolyak, then alderman and ward committeeman for Roque's ward, sent him to see Griffin and Ronan to discuss his role in the campaign. He further explained the link between the color red and the Hispanic community: red and white are Puerto Rican colors, and the Northwest Side of Chicago is predominantly Puerto Rican. He also stated that he had a conversation with Griffin and Ronan about using red materials, in which he was told to continue doing it. He recognized certain exhibits, saying that he had ordered them for the campaign.

At the close of Progress' case, the court considered defendants' objections to admission of the exhibits. Defendants raised a general "best evidence" objection to all items, but Progress had possession of originals as well, which it had made available during discovery.

Defendants also argued that the documents were not necessarily prepared entirely by Progress or contemporaneously with the ordering (*e.g.*, the orders often bore later notations by the production department, signatures were unauthenticated, some parts were obliterated) and thus were not admissible as business records. The court again reserved ruling and asked for memoranda on the objections.

Defendants also moved for a directed finding, arguing that Progress had not presented a *prima facie* case against the candidate. They argued that the candidate could not be held personally liable for the Committee's debts because she was not a party to the transactions, as demonstrated by their impeachment of Stanley on the time and place of the initial conversation between him and the candidate, and that Martin's testimony about his meetings with the candidate was not credible. Progress responded by arguing that (1) the candidate initiated the transactions in her conversation with Stanley and thus became a party to the transactions even though she later acted through agents; (2) the candidate was not immune from personal liability for the debts of the Committee, an unincorporated association, which Progress characterized as the business equivalent of a partnership; (3) the people who placed the orders at issue had apparent authority to do so, and in any event, the orders had been ratified because they had been accepted and used without complaint; and (4) the benefit of Progress' services accrued to the candidate herself, permitting Progress to recover in *quantum meruit*. The court denied defendants' motion.

Defendants began presentation of their case by calling Wanda Smolinski, who had served as the candidate's personal secretary at City Hall and, as such, received all visitors and telephone calls. She did not recall Pitz coming to more than one campaign staff meeting there and stated that in November 1982, the candidate had told Griffin to fire Pitz for "very unprofessional work." Kathy Byrne (Kathy), the candidate's daughter, testified that she met Pitz at a meeting at City Hall in November 1982 at which her mother and Griffin, among others, were present. She recalled only one other encounter with Pitz, which occurred at the main campaign headquarters where Kathy worked. Thomas Geary, the candidate's director of personnel, also testified. He remembered Pitz attending campaign staff meetings "once or twice, *** no more than a handful," all of which were early in the campaign.

In her testimony, the candidate denied both the meeting with Stanley at City Hall and the telephone conversation with him. She herself placed no printing orders, and she had not given authority to

anyone, including Pitz or Roque, to order printed materials. In addition, she had "absolutely" no knowledge that Pitz, Bator, or others were ordering printed materials. She also denied that Roque had a role in the campaign or her authorization to use red materials. She had seen Pitz only once during the campaign, at a meeting in the conference room behind her City Hall office in November 1982 at which Pitz presented a proposed logo for the campaign. After this meeting, the candidate told David Sawyer, a campaign consultant, to "[g]et rid of [Pitz] and follow up on it."

According to the candidate, after campaign staff meetings, which she did not attend, she would pre-approve printing jobs for known costs on the basis of the staff's recommendations. She acknowledged that she had approved some of the orders and that she signed Committee checks to Progress, but she denied having seen the bills for them, stating that she had rarely read bills for checks she signed because she did not have the time. She also denied authorizing joint advertising with other candidates. When she received Progress' bill for about $100,000 after the election, she told Griffin to take care of it and that she hadn't authorized it. At her request just after the election, Progress sent her a two-page list of invoices, which contained names of other candidates; she also asked Stanley for additional documentation.

On cross-examination, the candidate testified that she "certainly was in charge of the campaign" and that "as far as who has authority to do what in a campaign, [she] ha[d] the final word." She conceded that she had not submitted a written protest to Progress, although she had made an oral one, and that she had paid Progress $10,000 in November 1983. She said she did not talk with anyone from Progress during the campaign, nor did she ask Griffin to tell Progress where to send the bills.

Defendants called Griffin as their final witness. He stated that Vrdolyak, not the candidate or the Committee, put Roque in charge of the campaign field office on the northwest side. He had no conversations with the candidate about Progress' bills.

After defendants rested, the parties argued the evidentiary objections. The court overruled the objections and admitted the challenged exhibits, with the caveat that admission as evidence was not an indication that Progress had established authorization or that the bills were valid.

In Progress' rebuttal case, Stanley returned to the witness stand. He received no call from the candidate between February and November 1983, and he had not sent the two-page statement she described

in her testimony. He also stated that he had provided printing for hundreds of political candidates for 50 years, starting with Mayor Kennelly, and that the custom and practice in Chicago mayoral campaigns was never to contact the candidate. On cross-examination, he conceded that normally he has nothing to do with billing, other than checking it.

By means of an evidence deposition, Carl Bator testified for Progress. He stated that he was a volunteer for the candidate's campaign, and that Griffin had authorized him to organize the distribution and delivery of printed campaign materials. He identified three names that appear on the exhibits as campaign volunteers who had picked up printed materials from Progress at his direction; he described some signatures as "similar to" those of two of the volunteers, but he was unfamiliar with the third person's signature. As for the documents with his name, he said that it was possible that the signatures were not his. He also identified three other names on the exhibits as volunteers at the campaign's main headquarters, where many of the orders had been delivered. Two other names he identified as volunteer co-ordinators working on the west side and southwest side of Chicago, respectively. To his knowledge, only Griffin and, through him, Pitz had authority to order printed materials for the campaign. He stated that he himself placed orders only for unspecified materials that had been ordered previously by authorized people, in order to replenish the supplies, and did so only at Griffin's direction, but he later could not recall placing any orders, in particular the three orders that identify him as the person ordering the materials. He did not recall the contents of deliveries for which he signed, saying that he seldom verified that the delivered items corresponded with the description on the delivery ticket.

After hearing closing arguments, the court entered judgment against both defendants, jointly and severally, in the full amount of the outstanding balance on the account. The court observed that, for exhibits 1 through 27, there was no evidence of nondelivery and payment had been made without objection. The court characterized this conduct as "an acknowledgement on the part of the defendants that Pitz, [K]athy Byrne, and Roque were authorized, in some way, to place the orders. And it certainly cloaks them with, at least, apparent authority to make orders."

With regard to the other unpaid orders, the court found that the candidate had designated Griffin as the person in charge of the account with Progress with the concomitant duty to oversee it. Therefore, when Griffin received the invoices, he was obliged to raise any

questions concerning the propriety of the order, which would have put Progress on notice that something was awry. The court found that defendants could not accept the goods, use them without objection, and then much later refuse to pay for them, commenting "each order was either made by a person with actual or apparent authority. Some cases, there's no name as to who ordered, but there is a name as to whom the items were delivered." The court noted that the parties had conversations about payment after the election, that $10,000 had been paid later, and that more payment was promised, so any authorization objection was untimely. In the court's opinion, through receipt and use of the goods rather than questioning the subsequent invoices, the orders had been ratified. As for the alterations to the exhibits, the court found that some changes were for internal reasons, not the result of fraud, and that the alterations were not fatal. The court also held that the candidate was personally liable because it was she who told Stanley that Progress was selected for the work and there was no suggestion that she would not receive the benefits or be responsible.

Defendants moved for reconsideration, arguing that (1) 13 of the 30 orders at issue had been submitted by people other than Pitz, Roque, and Kathy, in whom the court found apparent authority on which Progress could rely, so the finding of apparent authority should not have been applicable to those 13 orders, especially the six that did not identify the orderer; (2) Griffin was not designated an agent by the candidate; (3) holding the candidate personally liable for the Committee's debts was inconsistent with State and Federal revenue laws as well as Illinois business enterprise principles; and (4) to find the candidate herself liable was contrary to public policy in that by extension it would make candidates liable for staff members who engaged in conduct for personal benefit under the guise of a campaign. The court granted the motion for reconsideration but affirmed its ruling. This appeal followed.

I

Before addressing whether the circuit court's judgment was against the manifest weight of the evidence, this court first must determine whether the contested exhibits were properly admitted. This sequence in our analysis is necessary because a ruling on whether a judgment is against the manifest weight of the evidence necessarily takes into account only admissible evidence.

Here, the challenged exhibits comprised a number of parts. Each contained, among other things, a job ticket prepared by Progress; an invoice, also prepared by Progress and addressed to Brady, dated

shortly after each order was produced and including the billing amount; and a sample of the item, such as letterhead stationery, an invitation to a campaign function, or an exhortation to vote for the candidate by name or to "Punch 10" or both. Thirteen of the thirty challenged exhibits include a purchase order from Pitz; all but four exhibits contain a Progress delivery form, with the signature of the person accepting delivery or picking up the items. Defendants contend that admission of these exhibits was improper generally because Progress failed to meet its burden of proving by a preponderance of the evidence that the candidate had granted authority to those who placed the orders, especially the 14 orders placed by Pitz,[2] making the exhibits irrelevant and immaterial. In particular, they object to admission of the exhibits for the six orders that do not identify the person who placed the order,[3] given that authority cannot be vested in the unknown, and to admission of the exhibits for the three orders that identify Bator as the person placing the order,[4] given his testimony that he had not placed the orders nor had he authority to do so. They also object to these exhibits generally as business records on the ground that people other than Progress' staff might have written on them. Defendants further contend that, having conceded that certain documents were altered, Progress failed to meet its burden of demonstrating circumstances that would make the alterations lawful. This made the documents too unreliable, they claim, to be admissible.

■ We agree with Progress that defendants' argument that it had the burden of proving agency prior to admission of the exhibits "puts the cart before the horse." As the circuit court carefully explained, admission of the exhibits was not tantamount to a finding of agency, a question of fact. Instead, when ruling on defendants' relevance objection, the issue the court resolved was whether the evidence tended to make a fact at issue more probably true than not; a circuit court's decision on this question will be overruled only if it represents an obvious abuse of discretion. *Betts v. Manville Personal In-*

---

[2]Defendants cite exhibits 28 through 30, 32 through 37, 40 through 41, and 44, but for our analysis we include in this group exhibits 38 and 47, which also contain purchase orders by Pitz.

[3]Exhibits 45, 48, 49, 53, 54, and 57. Defendants also characterize exhibit 46 as an order placed by an unknown person, but the job ticket lists Bator as the person who placed the order even though he could not recall placing orders, so we do not include it in our analysis of this group.

[4]Exhibits 42 and 43, and presumably 46, which as noted above, lists Bator as the person who placed the order.

*jury Settlement Trust* (1992), 225 Ill. App. 3d 882, 922, 588 N.E.2d 1193, 1219 (abuse of discretion to admit evidence irrelevant to facts at issue).

The exhibits at issue here were admissible over relevance objections because each tended to prove a fact at issue. For example, the job tickets and samples tended to prove that Progress had performed the work for which it demanded payment, and the delivery forms tended to prove that campaign workers had received the orders. The invoices tended to prove that Progress had promptly afforded defendants an opportunity to repudiate, which defendants contested. Consequently, because the evidence challenged here tended to prove that contested facts were more likely true than not, the circuit court did not abuse its discretion in admitting the exhibits over defendants' relevance objections. In addition, the job tickets, invoices, and delivery tickets are statements by Progress, and thus they are not barred by the rule prohibiting admission of a purported agent's statements to a third party when used to establish the existence of an agency relationship. *City of Evanston v. Piotrowicz* (1960), 20 Ill. 2d 512, 518, 170 N.E.2d 569, 573.

■■ ■ Defendants' objection to the exhibits as not qualifying under the business records exception to the hearsay rule is not supported by the plain wording of Supreme Court Rule 236 (134 Ill. 2d R. 236), which requires only that the party tendering the record satisfy the foundation requirement of demonstrating that the record was made in the regular course of business at or near the time of the transaction.[5] As a result, because Stanley, Progress' president, testified that the job tickets, invoices, and delivery forms were prepared in the ordinary course of Progress' business at or near the time of each order, Progress satisfied the threshold requirement for admission of these items under the business records exception to the hearsay rule. (*In re Marriage of Malec* (1990), 205 Ill. App. 3d 273, 291-92, 562 N.E.2d 1010, 1023, *appeal denied sub nom. Malec v. Zuria*

---

[5]The rule states that

"[a]ny writing or record *** made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility." 134 Ill. 2d R. 236(a).

(1991), 136 Ill. 2d 545, 567 N.E.2d 333; *Ford Motor Credit Co. v. Neiser* (1990), 196 Ill. App. 3d 515, 522-23, 554 N.E.2d 322, 327 (trend in admitting business records is liberal interpretation of the exception, given the incremental nature of today's business practices).) As for defendants' objection to certain records as unreliable because they contained insufficiently explained alterations, the alterations affect only the probative weight to be given to the documents, not their admissibility. (*Malec*, 205 Ill. App. 3d at 291-92, 562 N.E.2d at 1023 (because handwritten notes by unknown authors affected only the weight of the evidence, not its admissibility, circuit court's exclusion of personnel files was improper).) Thus, the circuit court's decision to admit the documents despite the alterations was not an abuse of discretion.

## II

The circuit court found that all those who placed the orders had apparent or actual authority, and additionally that all of the orders were ratified. Defendants insist that even if the evidence discussed above were admissible, the burden of proof here was on Progress to establish authorization or ratification, not on them to refute it, and Progress failed to present sufficient proof that the unpaid orders were authorized.

When determining whether the circuit court's findings were correct, we review the record while keeping in mind that the existence of an agency relationship, and of the purported agent's authority, generally is a question of fact that must be proved by a preponderance of evidence. (*Granite Properties Limited Partnership v. Granite Investment Co.* (1991), 220 Ill. App. 3d 711, 713-14, 581 N.E.2d 90, 92, *appeal denied* (1992), 143 Ill. 2d 638, 587 N.E.2d 1014.) Such findings of fact will be overturned only if against the manifest weight of the evidence. (*Stanton v. Republic Bank* (1991), 144 Ill. 2d 472, 479, 581 N.E.2d 678, 681.) For the purpose of our analysis, we divide the 30 unpaid orders into two groups. Group A comprises the 17 orders placed by Pitz or Roque,[6] both of whom had ordered printed materials for which the Committee specifically paid without question, as shown in exhibits 1 through 27, the ledger sheet, and Seweryn's testimony. Group B contains the other 13 unpaid orders, seven of which were

---

[6]As noted in footnote 2, the orders by Pitz include exhibits 28 through 30, 32 through 38, 40 through 41, 44, and 47. Exhibits 52, 55, and 56 were placed by Roque.

placed by people identified during the trial as campaign workers[7] and six of which do not identify who placed the order.[8]

## A

Defendants point to Stanley's testimony of the sole conversation between the candidate and Stanley, in which he testified that she mentioned only Griffin's name when she told him Progress would do the campaign printing work, as proof that only Griffin had authority to place printing orders. An agent's authority must be based on the acts of a principal, they observe, and Progress presented no evidence whatsoever that the candidate gave such authority to anyone other than Griffin, who placed none of the orders. Moreover, they argue, Progress presented no evidence that Griffin had been authorized to delegate his authority to anyone, including Pitz or Roque. Thus, they reason, because Progress had been told only of Griffin's authority, it had a duty to ascertain the scope of authority for anyone else submitting an order; not having done so, in their view, Progress filled the orders at its peril.

■ Defendants' argument is predicated on its assumption that the lack of express authority from the candidate to place printing orders is dispositive. To be sure, one generally is bound only by one's own contracts. In an agency relationship, however, a principal may empower an agent with the authority to enter into contracts with third parties on the principal's behalf. (*Clapp v. JMK/Skewer, Inc.* (1985), 137 Ill. App. 3d 469, 472, 484 N.E.2d 918, 921.) Although an agent's authority generally is exclusively personal, courts will infer, under certain circumstances, a power of delegation to a subagent. *Schweiker v. Husser* (1893), 146 Ill. 399, 422-23, 34 N.E. 1022, 1029 (delegation inferable if the act is "purely mechanical, ministerial, or executive, involving no elements of judgment, discretion or skill," if "imperatively necessary" so that principal's interest will not suffer, or if in the context of a known and established usage and course of dealing).

■ An agent's authority to bind a principal may be actual or apparent, or it may be created by estoppel, with some courts holding that proof of detrimental reliance is not required. (Compare *Northern Trust Co. v. St. Francis Hospital* (1988), 168 Ill. App. 3d 270, 278-79, 522 N.E.2d 699, 704, *appeal denied* (1988), 121 Ill. 2d 572, 526

---

[7]Exhibits 31, 39, 42, 43, 46, 50, and 51.

[8]Exhibits 45, 48, 49, 53, 54, and 57.

N.E.2d 833 (required), with *Uhr v. Lutheran General Hospital* (1992), 226 Ill. App. 3d 236, 247-49, 589 N.E.2d 723, 733, *appeal granted* (1992), 145 Ill. 2d 645 (not required, specifically rejecting *Northern Trust*).) Actual authority is express or implied; express authority is, of course, a specific grant of authorization to perform a particular act, and implied authority is that which is inherent in an agent's position. (*Villa v. Arthur Rubloff & Co.* (1989), 183 Ill. App. 3d 746, 750, 539 N.E.2d 364, 366, *appeal denied* (1989), 127 Ill. 2d 643, 545 N.E.2d 133 (a general grant of authority to manage a business impliedly includes the duty to make contracts; employ, supervise, and discharge; receive payments for and pay debts of the principal; and direct the ordinary operations of the business).) As noted above, however, actual authority is unnecessary to justify holding a principal liable for its agent's transactions on its behalf because

> "a principal will be bound by the authority he *appears* to give to another, as well as that authority which he actually gives. [Citation.] Apparent authority arises where a principal creates, through words or conduct, the reasonable impression that the putative agent has been granted authority to perform certain acts. [Citations.] Apparent authority is that authority which a reasonably prudent person, in view of the principal's conduct, would naturally suppose the agent to possess. [Citation.] The principal, having created the appearance of authority, is estopped to deny it to the detriment of a third party." (Emphasis in original.) *State Security Insurance Co. v. Burgos* (1991), 145 Ill. 2d 423, 431-32, 583 N.E.2d 547, 551.

See also Hetherington, *Trends in Enterprise Liability: Law & the Unauthorized Agent*, 19 Stan. L. Rev. 76 (1966) (describing trend to protect consumers who are deceived by imposter/agents in the course of routine business transactions, with liability falling on those who allowed the deception to occur).

■ For the orders placed by Pitz and Roque, application of the doctrine of apparent authority controls. Even if we were to agree that Progress initially acted at its peril in filling orders placed by anyone other than Griffin, the person Progress had been told would oversee the account, having received payment expressly for orders placed by these two, Progress' belief that they had been authorized in some way to place orders became reasonable because under the standard articulated by the Illinois Supreme Court in *State Security Insurance Co.*, when the Committee reimbursed Progress for Pitz's and Roque's orders, it "create[d], through words or conduct, the reasonable impression that [Pitz and Roque] ha[d] been granted authority" to place

similar orders. This holds true even for materials printed in colors other than green because, as noted above, at least one of the checks specifically paid an invoice for red materials. Without notice from their principal that these two lacked such authority, Progress had no duty to verify their authorization for subsequent orders of a similar nature. As a result, "having created the appearance of authority, [defendants are] estopped to deny it to the detriment of a third party," in this case, Progress. Thus, the circuit court's ruling that Pitz and Roque had apparent authority to place orders was not against the manifest weight of the evidence.

■ Similarly, the Committee may be held liable for the orders in group B despite defendants' contention that acknowledgement of contractual obligations incurred by one purported agent will not excuse a lack of reasonable diligence in ascertaining the scope of another purported agent's authority. By not communicating to Progress that only particular persons had authority to place orders or that expenses had to be within certain limits, and then making a $50,000 lump sum payment for orders placed by a number of campaign workers in addition to Pitz and Roque, the Committee fostered a reasonable belief that campaign workers were authorized to place printing orders for campaign materials in reasonable amounts. Although we agree with defendants that third parties have a duty to verify an agent's authorization to enter contracts on behalf of its principal, the duty is one of *reasonable* diligence. Under the circumstances here, when every order was for the campaign and each order was placed, accepted, and used by campaign workers, when the turnaround time for the orders was often short, and when Stanley's unrebutted testimony was that it was customary not to contact a candidate directly, Progress committed no breach of duty in not inquiring further. Too, a third party's duty in this regard does not obviate a principal's own duty to third parties, which is to exercise reasonable diligence in monitoring its agents' activities so that they are not exceeding their authority, particularly when the information is as readily available as it was here. Were the circumstances different, if for example a campaign worker had placed an order that a vendor, in the exercise of reasonable prudence, should have suspected was for the worker's own benefit rather than the principal's, we would expect a higher level of scrutiny by the vendor. (See, *e.g., Lincoln Cardinal Partners v. Barrick* (1991), 218 Ill. App. 3d 473, 578 N.E.2d 316 (third party had duty to investigate further when it knew that agent was acting in manner adverse to principal's interests).) That, however, is not the case here, where the orders by their nature were exclusively for the benefit of the candidate and were

placed and accepted only by campaign workers. Consequently, the circuit court's finding that under the circumstances here, the orders in group B also were apparently authorized was not against the manifest weight of the evidence.

## B

The circuit court found alternatively that the orders had been ratified because they had been used without objection even though Griffin had the opportunity to repudiate the orders after he received the invoices within a few days of each order. Defendants contend that Progress did not meet its burden of proof on the issue of ratification of the unpaid orders because not only did Progress fail to present evidence that the candidate actually knew about each of the unpaid orders before the election, but the evidence is otherwise. Sending invoices to Brady did not help, in defendants' view, because the invoices lacked the name of the orderer and thus had insufficient information to allow repudiation.

■■ Ratification is the equivalent of authorization, but it occurs after the fact, when a principal gains knowledge of an unauthorized transaction but then retains the benefits or otherwise takes a position inconsistent with nonaffirmation. (*Hofner v. Glenn Ingram & Co.* (1985), 140 Ill. App. 3d 874, 883, 489 N.E.2d 311, 316-17.) Generally, the question of ratification turns on the principal's intent to affirm. (*Peskin v. Deutsch* (1985), 134 Ill. App. 3d 48, 55, 479 N.E.2d 1034, 1039.) As with their objection to the Pitz and Roque orders, the essence of defendants' argument is the lack of evidence of express ratification by the candidate. Like authority, however, ratification need not be express; it may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an unauthorized transaction. (*Security Insurance Co. v. Mato* (1973), 13 Ill. App. 3d 11, 16, 298 N.E.2d 725, 729; *Mateyka v. Schroeder* (1987), 152 Ill. App. 3d 854, 864-66, 504 N.E.2d 1289, 1295-97 (failure to return benefits after reasonable time may be construed as ratification).) Of significance here, although normally a principal's actual knowledge of the transaction is essential, "one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had full knowledge of the facts." 18 Ill. L. & Prac. *Estoppel* §23, at 84 (1956).

■■ In her conversation with Stanley, the candidate indicated that Griffin was the person in charge of the printing arrangements. It was to Griffin that Progress sent its invoices. Thus Griffin was in the best position to discover any impropriety promptly, given that the invoices

detailed the content and size of each order and thus contained sufficient information to permit repudiation even though they lacked the name of the orderer. Griffin, however, by his own admission rarely even opened the invoices and reviewed none of them. Any lack of actual knowledge of the unauthorized orders is therefore the result of his breach of the duty to gain knowledge of the transactions by simply reviewing the invoices, a breach that has the same legal effect as actual knowledge of the facts and which may be imputed to his principal. In addition, the benefits of the transactions were retained in that the campaign staff accepted the materials, which were then used without question. Thus, the circuit court's decision that the unpaid orders were ratified was not against the manifest weight of the evidence, because the evidence demonstrated that defendants' designated agent had the opportunity to repudiate the orders and that defendants "took a position inconsistent with nonaffirmation" by accepting and using the products of those transactions without objection. To hold otherwise would permit a principal to foist liability onto third parties on the basis of its lack of actual knowledge of an unauthorized transaction even when its ignorance of the facts is the direct result of its expressly designated agent's neglect.

### III

The circuit court held that the candidate was personally liable because it was she who initially spoke with Stanley, telling him that Progress would perform printing for her campaign and it was she whom the work benefitted.

The candidate claims that the circuit court erred in making no distinction between her and the Committee. In support, she cites portions of the Election Code (Ill. Rev. Stat. 1983, ch. 46, par. 9—1 *et seq.*), which she claims makes a political committee an entity separate from a candidate, with the ability to incur financial liabilities and the concomitant sole responsibility to pay for them. She points for additional support to the separation between the personal and the political as acknowledged by different tax treatment in both State and Federal revenue laws as well.

The candidate's citations to tax laws and the Election Code are inapposite to the issue here. The Election Code contains only the requirements for disclosure of campaign contributions and expenditures; significantly, it permits a political committee to take any form, from the candidate alone to a corporation. Similarly, the revenue laws concern tax treatments. None of these statutes indicates a legislative intent to affect the application of tenets of business enterprise law

when the enterprise is a political committee. Accordingly, the question presented in this case is a straightforward one: whether, under the circumstances, the candidate may be held personally liable for the Committee's debts.

The candidate argues that she is liable neither directly nor vicariously under the facts in the record and the applicable law. She argues that ratification, if any, was by the Committee, not her, because it was the Committee's funds that paid the bills, and the debts of a voluntary association are those of the association alone, citing *Whitehead & Hough Co. v. Donovan* (1918), 210 Ill. App. 268. *Whitehead*, however, is an abstract opinion; as such, it carries little if any precedential value. (*Cochran v. Great Atlantic & Pacific Tea Co.* (1990), 203 Ill. App. 3d 935, 937, 561 N.E.2d 229, 230.) In addition, this statement of the law is incorrect.

■■ Although the candidate characterizes this case as one of first impression in Illinois, a similar suit was filed against William Hale "Big Bill" Thompson in *Severinghaus Printing Co. v. Thompson* (1926), 241 Ill. App. 35. In *Severinghaus*, a printer sued Thompson for unpaid bills for campaign literature that had been furnished to the William Hale Thompson Republican Organization, which Thompson headed. Although the circuit court had directed a verdict for Thompson, the appellate court reversed, noting that the plaintiff had presented sufficient evidence that Thompson had approved and ratified the printing contracts, so a directed verdict was improper. The court noted that much support existed for the plaintiff printer's theory that

> "if a member of a voluntary association, the objects of which do not contemplate profit or loss in the business sense, expressly or impliedly authorizes a transaction in which an indebtedness is incurred by or on behalf of such association, or if he assents to or ratifies the contract on which such a liability is predicated, he is liable as a principal for the indebtedness." (241 Ill. App. at 39.)

The court also observed that "in such cases the liability of the participating, assenting or ratifying members is joint and several, and that it is a question for the [fact finder] to determine to whom the credit was given and whether the members authorized or ratified the contract." (241 Ill. App. at 39.) Therefore, we see no legal bar generally to holding the candidate jointly and severally liable for the Committee's debts. More particularly, even if the candidate did not have actual knowledge of each transaction, which is questionable given her conversation with Martin about a very small order, her lack of awareness, as explained above, was the direct result of her own and Grif-

fin's admitted failure to avail themselves of the opportunity to repudiate the purportedly unauthorized transactions upon receipt of the invoices. Therefore, like any member of a voluntary association who knows, or should have known under the circumstances, that a transaction has occurred and who then accepts its benefits for herself, the candidate here may be held liable for the Committee's debts.

■■■ Moreover, we are persuaded by the record here that although the Committee was in form a voluntary unincorporated association, it was in substance a sole proprietorship. The candidate was the chairman of the Committee and the other two officers were family members. Even though the candidate was not the Committee's treasurer, only she signed the Committee's checks. The Committee had but a single purpose, election of its chairman to public office. By the candidate's own testimony, it was she who was in charge of the campaign. She herself initiated the series of transactions here, and the materials at issue were ordered and used for her benefit and could have had no other purpose. Unlike, for example, a parent-teacher association or a softball team, the purpose of which is to advance the interests of the group as a whole, with control of the association shared among officers, the Committee was controlled by and for the benefit of one person, the candidate.

Under these circumstances, just as a court in equity may hold corporate officers and directors personally liable by "piercing the corporate veil," so too was it appropriate for the circuit court to find the candidate herself liable here because the Committee had no personality separate from the candidate, and substantial injustice would result from an opposite conclusion. (*Melko v. Dionisio* (1991), 219 Ill. App. 3d 1048, 1063, 580 N.E.2d 586, 594-95 (courts will "pierce the corporate veil" if a corporate entity is the alter ego of the dominant personality and adherence to the fiction of a distinct corporate personality would result in injustice).) Had the candidate wished to avoid personal liability for campaign debts, she had the option under the Election Code of refraining from membership in the association. Alternatively, she could have chosen to incorporate the Committee, as she did later, the standard method for avoiding personal liability. The candidate chose not to incorporate, to be chairman of the Committee, to have no one other than family members as Committee officers, and to retain "the final word." This choice carries with it the potential for contractual liability to third parties. Accordingly, the circuit court's ruling that the candidate may be held individually liable on the record here was not against the manifest weight of the evidence.

## IV

■■ Although we affirm the circuit court's judgment with regard to joint and several liability, we cannot affirm the judgment for the entire $91,075.86, which is the account's outstanding balance according to the ledger. The circuit court did not calculate the amount due, entering judgment in the amount requested in the complaint with no objection from defendants. Our comparison of the ledger with the exhibits, however, reveals four entries[9] for which Progress submitted to the circuit court no invoices, job tickets, or other supporting documentation. Accordingly, because Progress presented no evidence that these orders were placed or accepted by campaign workers, facts upon which the circuit court relied in its findings generally, judgment on those orders would be against the manifest weight of the evidence. Therefore, we vacate the judgment as to the amount, and we remand for entry of a judgment of $74,494.56, as we are empowered to do under Supreme Court Rule 366(a) (134 Ill. 2d R. 366(a)).

For the reasons stated above, we affirm the circuit court's judgment on defendants' liability, but we vacate the judgment as to its amount and remand for entry of a judgment against defendants jointly and severally in the amount of $74,494.56.

Affirmed in part; vacated in part and remanded.

SCARIANO and GORDON, JJ., concur.

---

[9]Invoice Nos. B11377 ($125.00), B11378 ($300.00), B11444 ($8,579.90), and B11496 ($7,576.40).