**SPHERE DRAKE INSURANCE LIMITED, Plaintiff– Counterdefendant,**

v.

**ALL AMERICAN LIFE INSURANCE COMPANY, Defendant– Counterplaintiff.**

No. 99 C 4573.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 22, 2003.

James I. Rubin, Kevin Jason O'Brien, Renton Douglass Bond, Teresa Lynn Snider, Butler Rubin Saltarelli & Boyd LLP, Stanley Carlylle Sneeringer, Law Offices of Stanley Sneeringer, Chicago, IL, for plaintiff.

Laura Ann Derouin, Holland & Knight LLC, Tasha Jackson Brown, Peterson & Ross, LLC, George N. Vurdelja, Jr., John

M. Heaphy, Griswold L. Ware, Vurdelja & Heaphy, Chicago, IL, Andrew S. Amer, Kathleen L. Turland, Lanier Saperstein, Chet A. Kronenberg, Simpson Thacher & Bartlett LLP, Vincent J. Vitkowsky, Peter T. Maloney, Edwards & Angell, L.L.P., New York City, Eric L. Webb, Simpson Thacher & Bartlett, Los Angeles, CA, Donald Alan Murday, Chittenden, Murday & Novotny, LLC, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

## I. BACKGROUND

The underlying dispute in this case concerns whether plaintiff-counterdefendant Sphere Drake Insurance Limited,[1] an English corporation, is liable to defendant-counterplaintiff All American Life Insurance Company,[2] an Illinois corporation, on a retrocession policy know as the "Unicare Retrocession."[3] In its Amended Complaint, Sphere Drake seeks a declaration that the Unicare Retrocession is void because the Sphere Drake agent[4] that issued the retrocession exceeded its authority in that EIU acted beyond the monetary limits of the Binding Authority and with the knowledge of a purported agent of All American (the "excess authority" claim). Sphere Drake also contends EIU violated its fiduciary duty with the knowledge of or in conspiracy with All American's purported agents[5] (the "fiduciary duty" claim). Sphere Drake seeks a declaration that the Unicare retrocession was void *ab initio;* it does not seek any other relief. All American counterclaims for a declaration that the Unicare Retrocession is valid and enforceable and seeks compensatory damages for the amount due

1. Sphere Drake has gone through various name changes during the times pertinent to this lawsuit. Throughout today's opinion, plaintiff-counterdefendant will be referred to as "Sphere Drake," regardless of the time period under discussion.

2. At the end of 2002, All American merged into American General Life Insurance Company. The case will continue in the name of defendant-counterplaintiff All American. *See* Fed.R.Civ.P. 25(c); Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 1958 (2d ed.1986).

3. "Retrocessional agreements are agreements by which an insurance company which has agreed to reinsure a risk assigns all or a portion of that risk to a reinsurer who accepts such risk. In effect, a retrocessional agreement is reinsurance of reinsurance." *United Equitable Insurance Co. v. Reinsurance Co. of America, Inc.,* 157 Ill.App.3d 724, 109 Ill.Dec. 846, 510 N.E.2d 914, 916 n. 3 (1987), *appeal dismissed,* 117 Ill.2d 554, 115 Ill.Dec. 410, 517 N.E.2d 1096 (1987). The Unicare Retrocession reinsures the Unicare Insurance Company, Workers Compensation Excess of Loss Reinsurance contract (the "Unicare Reinsurance Policy").

4. Sphere Drake's purported agent is Euro International Underwriting Ltd. ("EIU"), an English corporation. EIU purportedly acted under a subdelegation of binding authority (the "Binding Authority") that Sphere Drake issued to Horace Holman International Limited ("Horace Holman"). EIU's authorized principals were John Whitcombe and Christopher Henton, both of whom reside in England.

5. The parties agree that Connecticut corporation WEB Management LLC ("WEB") acted as the agent of All American. WEB is partially owned by a subsidiary of Stirling Cooke Brown Holdings Limited, a Bermuda corporation. English corporations Stirling Cooke Insurance Brokers Limited and Stirling Cooke Brown Reinsurance Brokers Limited (collectively "Stirling Cooke") are also subsidiaries of Stirling Cooke Holdings. Sphere Drake contends that Stirling Cooke acted as broker and agent for All American, at the direction of WEB. All American contends that Stirling Cooke was a reinsurance intermediary, which it contends is not an agency relationship.

under the Unicare Retrocession. All American also contended that all claims were subject to arbitration and continues to seek arbitration of any arbitrable claims. It has previously been held that the excess authority claim is an issue for the court to decide, not the arbitrator. *Sphere Drake Insurance Ltd. v. All American Insurance Co.,* 256 F.3d 587, 590–92 (7th Cir.2001) (*"Sphere Drake II"*). *See also Sphere Drake Insurance Ltd. v. All American Life Insurance Co.,* 221 F.Supp.2d 874, 877–78 (N.D.Ill.2002) (*"Sphere Drake IV"*). If the excess authority claim is resolved in Sphere Drake's favor, the case is over and Sphere Drake is not liable on the Unicare Retrocession, but must return the premiums that were previously paid. If the excess authority claim is resolved against Sphere Drake, then the fiduciary duty claim must be considered, but that claim is to be resolved in arbitration, not by this court. *Sphere Drake IV,* 221 F.Supp.2d at 879–80.

Presently pending are the parties' cross motions for summary judgment on the excess authority claim and Sphere Drake's related motions to strike some of the evidence submitted by All American. Sphere Drake contends that undisputed evidence shows that, as of June 29, 1998 when EIU purported to accept the Unicare Retrocession on Sphere Drake's behalf, EIU lacked actual authority because it was not permitted to accept further policies on Sphere Drake's behalf because EIU had already exceeded the $12,000,000 premium limit applicable in 1998 under the Binding Authority EIU had to act on Sphere Drake's behalf. Sphere Drake contends that there could not be apparent authority for EIU's action because Stirling Cooke was actually aware the premium limit had been exceed-

ed. Alternatively, Sphere Drake contends that Stirling Cooke was constructively aware the premium limit had been exceeded because it knew there was a limit and had a duty to inquire as to whether it had been exceeded. Sphere Drake also contends that WEB had a statutory obligation to be aware of EIU's authority to act on Sphere Drake's behalf. Further, Sphere Drake contends that All American cannot show that it detrimentally relied upon any apparent authority that may have existed. In another alternative argument, Sphere Drake contends that, if Stirling Cooke was not an agent of All American, Sphere Drake could not have entered into any contract with All American.

All American contends Sphere Drake cannot be entitled to summary judgment because disputed facts support that there was actual authority for EIU to act on Sphere Drake's behalf because the premium limit was actually $20,000,000 and the amount of premiums represented by policies was less than $20,000,000 and even less than $12,000,000.

As to its own summary judgment motion,[6] All American contends undisputed facts support that there was apparent authority because Stirling Cooke's knowledge of the premium limit indicated the premium limit was subject to modification and Stirling Cooke was not required to inquire further as to whether the premium limit had been modified for 1998. All American also contends that Stirling Cooke did not have actual knowledge that the premiums for prior policies exceeded the existing premium limit nor was it required to inquire further. Additionally, All American contends Stirling Cooke was not its agent and therefore its knowledge cannot be imputed to WEB or All Ameri-

---

6. As to the contentions raised in its own summary judgment motion, All American alternatively contends that, to the extent there are

material factual disputes, the factual disputes would be a basis for denying Sphere Drake's summary judgment motion.

can. Alternatively, even if actual and apparent authority were both lacking, All American contends that Sphere Drake ratified the Unicare Retrocession, or waived objection thereto, by accepting premium payments and waiting until March 1999 before first attempting to rescind the contract.[7]

## II. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Turner v. J.V.D.B. & Associates, Inc.,* 330 F.3d 991, 994–95 (7th Cir.2003); *Palmer v. Marion County,* 327 F.3d 588, 592 (7th Cir.2003); *Abrams v. Walker,* 307 F.3d 650, 653–54 (7th Cir.2002). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Outlaw v. Newkirk,* 259 F.3d 833, 837 (7th Cir.2001); *Wollin v. Gondert,* 192 F.3d 616, 621–22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Binz v. Brandt Construction Co.,* 301 F.3d 529, 532 (7th Cir.2002); *Traylor v. Brown,* 295 F.3d 783, 790 (7th Cir.2002). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 236 (7th Cir.), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir.1991); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 476–77 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). As the Seventh Circuit has summarized:

The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 978 (7th Cir.1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548, 91 L.Ed.2d 265. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.' " *Logan,* 96 F.3d at 978. "Irrelevant or unnecessary

---

7. "Rescission" is actually a misnomer in the context of the present case. Rescission is the unmaking of an existing contract. *See Chicago Limousine Service, Inc. v. Hartigan Cadillac, Inc.,* 139 Ill.2d 216, 151 Ill.Dec. 342, 564 N.E.2d 797, 801 (1990). Here, Sphere Drake contends it was never actually a party to the contract. That is a key distinction because, were Sphere Drake attempting to withdraw from a valid contract, the issue would be one for the arbitrator. In any event, since the parties use the term, this opinion will also use the term. However, use of the term should not be understood as implying that Sphere Drake is attempting to withdraw from a contract. Its action is more accurately one of repudiation.

facts do not preclude summary judgment even when they are in dispute." *Id.* (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir.1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party....'" *Logan*, 96 F.3d at 978 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). *Outlaw*, 259 F.3d at 837.

Along with its answer to All American's summary judgment motion, Sphere Drake filed a motion to strike. With its reply in support of its own summary judgment motion, Sphere Drake filed an essentially identical supplemental motion to strike. Both motions concern All American's use of trial transcripts from an English lawsuit concerning similar issues regarding the Unicare Retrocession. Sphere Drake and All American are parties to that lawsuit, as well as all or some of the purported agents. Sphere Drake contends that any trial testimony is hearsay and that All American should have instead taken the depositions of the witnesses.

Sphere Drake did not notice either motion for presentation as is required by Local Rule 5.3(b). As is this bench's usual practice, following the initial motion to strike, an order was entered taking it under advisement to be decided with the summary judgment motions. This is done despite the fact that this bench looks with disfavor on separate motions to strike and expects a party to incorporate any evidentiary objections in either its summary judgment brief or a Local Rule 56.1 statement.[8] *See* N.D. Ill. Webpage for Judge Hart, "Motion Practice." *See, e.g., Alek v. University of Chicago Hospitals*, 2002 WL 1332000 *2 (N.D.Ill. June 17, 2002), *aff'd by unpublished order*, 54 Fed.Appx. 224, 2002 WL 31834017 (7th Cir.2002); *Anderson v. Cornejo*, 225 F.Supp.2d 834, 842 (N.D.Ill.2002). Instead of using its reply to respond to the objections included in the first motion to strike, All American waited until briefing on both summary judgment motions was completed and then jointly moved with Sphere Drake for a briefing schedule on the two motions to strike. At the May 14, 2003 hearing on the briefing schedule motion, All American's motion to file an answer was denied and All American was advised that it should have responded in its reply brief. The court also noted that it was generally capable of ruling on hearsay issues without additional input from the parties. Sphere Drake should not have filed separate motions to strike, but once it did, All American should have responded in its reply brief, particularly since the objections were also incorporated in Sphere Drake's

---

8. Sphere Drake also included the evidentiary objections in its Local Rule 56.1 response statement opposing All American's summary judgment motion and in its Local Rule 56.1 reply statement in support of its own summary judgment motion.

Local Rule 56.1 response statement. Nevertheless, in spite of the unnecessary and burdensome complexity, the court will consider the evidentiary objections.

 Sphere Drake's objections are generally without merit and represent a misunderstanding of summary judgment procedures. The material that is submitted in support of a summary judgment motion is not necessarily itself admissible at trial, but must set forth evidence that would be admissible if presented in appropriate form at trial. In other words, "[t]he evidence need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content." *Stinnett v. Iron Works Gym/Executive Health Spa. Inc.*, 301 F.3d 610, 613 (7th Cir.2002). Prior testimony under oath, whether at a deposition, hearing, or trial, that is based on personal knowledge may be considered on summary judgment because the person is likely to provide the same testimony if called to testify at trial. It is well settled that testimony given at the trial of a different case may be considered on summary judgment. *Kelley v. Price–Macemon, Inc.*, 992 F.2d 1408, 1415 n. 12 (5th Cir.1993), *cert. denied*, 510 U.S. 1043, 114 S.Ct. 688, 126 L.Ed.2d 656 (1994); *Langston v. Johnson*, 478 F.2d 915, 918 (D.C.Cir.1973); *Beiswenger Enterprises Corp. v. Carletta*, 46 F.Supp.2d 1297, 1299 (M.D.Fla.1999); *Kraft General Foods, Inc. v. Cattell*, 18 F.Supp.2d 280, 284 (S.D.N.Y.1998). Moreover, to the extent the witnesses are not available for trial, which is a substantial possibility given that all or most are residents of the United Kingdom, the former testimony itself would be admissible at a trial of this case. *See* Fed.R.Evid. 804(b)(1).

There is another aspect of Sphere Drake's objections that has merit. All American cites to comments of the English justice who presided at the trial. These comments are not findings because no ruling or judgment has yet been entered following the English trial. There is no contention that any of the statements are entitled to a collateral estoppel effect. The comments of Justice Thomas will not be considered. Questions that Justice Thomas asked of witnesses and the responses thereto will be considered to the same extent as responses to questions asked by the attorneys.

Sphere Drake also objects to the use of certain letters. To the extent the letters are potentially evidence of material facts, they will be individually considered in determining whether a genuine factual dispute exists. It is noted, though, that they may be admissible as party admissions. They also may be considered as evidence of communications that occurred or actions that were taken, not necessarily for the truth of the matters contained therein.

Sphere Drake's motions to strike will be granted in part and denied in part. No document will be stricken, but .to the extent the documents represent inadmissible evidence, they will not be considered as supporting a genuine factual dispute.

### III. APPLICABLE LAW

 All American contends Illinois law applies to the excess authority claim whereas Sphere Drake contends English law is applicable. The Unicare Retrocession, which is in the form of a slip policy,[9] provides in part: "This contract of Reinsurance shall be governed by and construed in accordance with the law of the

---

9. "A slip policy is a common type of policy in reinsurance. It contains an abbreviated statement of terms and generally incorporates an-

other insurance contract to define the extent of coverage." *Odyssey Re (London) Ltd. v. All American Life Insurance Co.*, No. 99 C 4573,

state of Illinois, U.S.A." Sphere Drake contends that this provision is inapplicable to contract formation issues [10] and that, instead, English law should be applied because it has the most significant relationship to the transaction. This issue need not be decided. As to every issue for which either side cites both Illinois and English law, both contend that the law of both jurisdictions is the same. Where the parties do not point to any conflict or outcome difference between possibly applicable laws, a federal court will apply the law of the state in which it sits. *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n. 7 (7th Cir.1993). Substantive Illinois law will be applied to the contract issues before the court that underlie the excess authority claim.

### IV. ACTUAL AUTHORITY

In order for Sphere Drake to be entitled to summary judgment, undisputed facts must support, among other things, that EIU lacked actual authority to act on Sphere Drake's behalf when entering into the Unicare Retrocession. All American contends there are material factual disputes regarding both the amount of the premium limit for 1998 and the amount of premiums represented by 1998 retrocessions that EIU had entered into purportedly on behalf of Sphere Drake.

There is no dispute that Sphere Drake entered into the Binding Authority which permitted EIU to act as its agent for retrocessional agreements. However, the Binding Authority contained a premium limit, that is a provision that EIU could not enter into retrocessional agreements that exceeded a certain monetary amount of estimated gross premiums for each

year. In January 1997, the Binding Authority provided in part: "The initial Estimated Gross Premium is to be agreed not exceeding £2 million (to be increased by mutual agreement) and information to be disclosed in Business Plan." Another provision of the Binding Authority provided for a set conversion rate of two dollars equal one pound, making the initial premium limit equivalent to $4,000,000. In March 1997, the gross premium limit was increased to $7,000,000 (£3,500,000). In December 1997, the limit was increased to $12,000,000 (£6,000,000). Sphere Drake contends this was the premium limit that remained in effect as of June 1998 when EIU accepted the Unicare Retrocession. All American contends that the reference to the EIU Business Plan indicates that the anticipated mutually agreed premium limit increases were to be consistent with EIU's Business Plan. The EIU Business Plan forecast $20,000,000 of gross premiums for 1997 and $28,000,000 for 1998. However, Sphere Drake required that increases in the gross premium limit be approved on a piecemeal basis.

Resolving all genuine factual disputes in All American's favor, the facts assumed to be true as regards actual authority are as follows. Vic Broad was the Sphere Drake underwriter and Director responsible for overseeing the agency relationship with EIU. In May 1998, EIU's Whitcombe asked Broad to increase the premium limit to $20,000,000. Broad referred Whitcombe to Michael Watson, Broad's superior and Sphere Drake's then-CEO. On June 3, 1998, Whitcombe met with Watson. At the English trial, Whitcombe testified about this meeting. Although, Whitcombe

---

slip op. at 3 (N.D.Ill. March 30, 2000) (*"Sphere Drake I"*) (Docket Entry 28).

**10.** Sphere Drake cites *Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.*, 986 F.2d 607, 611 (1st Cir.1993), for the general proposition that choice-of-law

provisions do not apply when contract formation is at issue. That case does not stand for that proposition. Instead, *Northeast Data* held that the particular language of the choice-of-law provision involved in that case did not provide that it was applicable to formation issues.

conclusorily stated at one point that his understanding after the meeting was that he had approval to write up to $20,000,000 in gross premiums, his specific testimony is to the contrary. Whitcombe testified that Watson indicated in principle that he would not oppose an increase but Broad was to put such approval and any details in writing. *See* March 27, 2002 English Trial Tr. at 32–39. No such writing was ever produced or approved.

The communications that followed were that Whitcombe sent Watson a June 9, 1998 letter stating in part:

It is my understanding that controlled expansion to a level of premium income in the region of $20,000,000 for 1998 would not alarm you and would certainly afford me a sound basis on which to plan events.

I am aware that you will be discussing our conversation with Vic Broad with a view to settling your own plans and wishes for the future. I will await his instructions.

In a letter dated June 17, 1998, Watson responded in part:

As I mentioned, the level of premium income which you would like to underwrite for 1998 would make you one of the largest individual coverholders for our company. It is therefore of paramount importance that the expansion is carefully controlled. I would like to understand the source of the new business and how it compares with the business mix which you provided to us initially.... As we both know, the recent administration of this facility through our shared intermediary has left a lot to be desired and this is a good opportunity to make sure all aspects are properly addressed. I have asked Vic Broad to address the relevant underwriting issues with you and Bob Forness, our Chief Operating Officer is addressing the administrative arrangements.

Please continue on a "business as usual" basis for now. I would like to feel that all of our necessary updating of records, information and procedures could be completed by mid-July.

■ These communications are consistent with the testimony that Watson indicated he looked favorably on an increase, but had not actually agreed to an increase. "Business as usual" would mean that there would continue to be piecemeal increases on an individual basis. All American provides no document showing that the increase to $20,000,000 was ever reduced to writing.

All American does not point to evidence adequately supporting a genuine factual dispute that the premium limit was ever increased to higher than $12,000,000 (£6,000,000).

Still to be considered is whether a genuine factual dispute exists regarding whether the $12,000,000 limit was exceeded in 1998. Sphere Drake contends that undisputed evidence shows that policies issued earlier in 1998 totaled $14,406,427 in gross estimated premiums and that the Unicare Retrocession itself exceeded the limit because it actually represented $19,659,062 in estimated gross premiums for 1998. All American does not raise any specific objections to the amount of estimated gross premiums Sphere Drake calculates for the preceding policies. *See* All American's Loc. R. 56.1 Response [145] ¶¶ 20–89; All American Answer Brief [146] at 10–12. All American contends that the correct 1998 gross premium calculation for the Unicare Retrocession is $9,864,917, the primary dispute being whether an approximately $19,600,000 premium should be evenly divided between 1998 and 1999 or whether it should all be considered 1998 gross premiums. All American's primary position, though, is that a Sphere Drake designee, Nick Bentley, admitted during his Rule 30(b)(6) deposition that no valid

1998 premiums existed prior to the Unicare Retrocession and that the Unicare Retrocession represented $6,200,000 in gross premiums.

██ All American's primary position is without merit. The cited testimony of Bentley that zero valid premiums existed as of June 1998 is based on taking as true Sphere Drake's contention that all policies were invalid based on the alleged fiduciary breach violations. *See* Bentley Dep. at 16–17. That is an alternative contention that is not presently under consideration. For present purposes, it must be assumed that no fiduciary duty violations occurred and the only question is whether EIU otherwise had actual or apparent authority. Bentley's testimony does not raise a genuine factual dispute as to the gross premiums for retrocession agreements EIU had already committed to for 1998. Since the gross premiums exceeded $12,000,000, EIU had already reached the limits of its actual authority prior to entering into the Unicare Retrocession in June 1998.[11]

Undisputed facts show that EIU exceeded the premium limit. Therefore, it cannot possibly be shown that EIU had actual authority to enter into the Unicare Retrocession.

## V. APPARENT AUTHORITY

██ Under Illinois law, "an agent may bind his principal by acts which the principal has not given him *actual* authority to perform, but which he *appears* authorized to perform." *Lundberg v. Church Farm, Inc.*, 151 Ill.App.3d 452, 104 Ill.Dec. 309, 502 N.E.2d 806, 813 (1986), *appeal denied*, 114 Ill.2d 547, 108 Ill.Dec. 418, 508 N.E.2d 729 (1987). "An agent's apparent authority is that authority which 'the principal knowingly permits the agent to assume or which he holds his agent out as possessing. It is the authority that a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.'" *Id.* (quoting *Hofner v. Glenn Ingram & Co.* 140 Ill.App.3d 874, 95 Ill.Dec. 90, 489 N.E.2d 311, 316 (1985)). *Accord A.J. Maggio Co. v. Willis*, 316 Ill. App.3d 1043, 250 Ill.Dec. 376, 738 N.E.2d 592, 598 (2000), *appealed dismissed*, 197 Ill.2d 397, 259 Ill.Dec. 132, 757 N.E.2d 1267 (2001); *International Union of Operating Engineers v. Triad Construction Services, Inc.*, 1999 WL 571053 *7 (N.D.Ill. July 29, 1999). Apparent authority must derive from acts of the principal. *Lundberg*, 104 Ill.Dec. 309, 502 N.E.2d at 813. In the present case, the burden is on All American to prove the existence of apparent authority, including by showing Stirling Cooke or WEB had knowledge of the facts and that a reasonably prudent person would have relied on those facts. *Id.*; *Triad Construction*, 1999 WL 571053 at *7. The inquiry focuses on three factors: (1) the manifestation to the third party by the principal; (2) the reasonableness of the third party's belief that authority extended to the act of the agent; and (3) the third party's detrimental reliance on the apparent authority. *Aspacher v. Kretz*, 1997 WL 692943 *5 (N.D.Ill. Aug. 13, 1997).

██ All American points to the principle that apparent authority is not limited by instructions that the principal may have placed on the agent, but which were not disclosed to the third party. *See Lundberg*, 104 Ill.Dec. 309, 502 N.E.2d at 813.

11. The $6,200,000 premium figure for the Unicare Retrocession is based on a dollar amount shown on the slip policy. Bentley testified that that is the amount that would have been apparent to an underwriter at the time the slip policy was issued. All American does not dispute that the actual estimated gross premium is at least $9,864,917. Adding that amount to the undisputed $14,406,427 of prior premiums, the Unicare Retrocession would have put EIU well over the limit even if the limit were $20,000,000.

However, the third party still must act with reasonable discretion and diligence. If the third party has information indicating that the agent's authority may be limited, it must make reasonable inquiry to ensure that there is authority. *General Refrigeration & Plumbing Co. v. Goodwill Industries of St. Louis. Mo.*, 30 Ill.App.3d 1081, 333 N.E.2d 607, 611 (1975); *Lincoln Cardinal Partners v. Barrick,* 218 Ill. App.3d 473, 161 Ill.Dec. 189, 578 N.E.2d 316, 318–19 (1991); *Schoenberger v. Chicago Transit Authority*, 84 Ill.App.3d 1132, 39 Ill.Dec. 941, 405 N.E.2d 1076, 1082 (1980); *Harrison v. Dean Witter Reynolds, Inc.*, 715 F.Supp. 1425, 1431–32 (N.D.Ill.1989), *aff'd in part, rev'd in part on other grounds,* 974 F.2d 873, 883–84 (7th Cir.1992), *cert. denied,* 509 U.S. 904, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993); *Rouse Woodstock, Inc. v. Surety Federal Savings & Loan Association,* 630 F.Supp. 1004, 1010 (N.D.Ill.1986). *See also Restatement (Second) of Agency §§ 166–67* (1958); *Almerico v. RLI Insurance Co.*, 716 So.2d 774, 780 (Fla.1998); *Diversified Development & Investment, Inc. v. Heil,* 119 N.M. 290, 889 P.2d 1212, 1218–19 (1995). *Cf. Herbert Construction Co. v. Continental Insurance Co.,* 931 F.2d 989, 996 (2d Cir.1991) (duty to inquire as to apparent authority is another way of saying that third party must act reasonably in relying on apparent authority).

The duty one has when dealing with an agent with apparent authority is set out in 3 Am.Jur.2d, Agency, sec. 78 (applied in *Lawcock v. United States Trotting Association,* [55 Ill.App.2d 211, 204 N.E.2d 802 (1965) ] ):

"A third person dealing with a known agent may not act negligently with regard to the extent of the agent's authority or blindly trust the agent's statements in such respect. Rather, he must use reasonable diligence and prudence to ascertain whether the agent is acting and dealing with him within the scope of his powers. The mere opinion of an agent as to the extent of his powers, or his mere assumption of authority without foundation, will not bind the principal, and a third person dealing with a known agent must bear the burden of determining for himself by the exercise of reasonable diligence and prudence, the existence or nonexistence of the agent's authority to act in the premises. The principal, on the other hand, may act on the presumption that third persons dealing with his agent will not be negligent in failing to ascertain the extent of his authority as well as the existence of his agency."

Substantially the same rule is set out in 2A C.J.S. Agency § 162, at p. 801–802. Although we do not find it necessary to also quote that entire section here, one sentence which appears at page 802 is particularly worth mentioning.

"If [the third person] knows, or has good reason for believing, that the acts exceed the agent's powers or if such reasonable inquiry as he is under the duty to make would result in a discovery of the true state of the powers, and he fails to fulfill that duty, he cannot assert an apparent authority effective against the principal."

*General Refrigeration,* 333 N.E.2d at 611. The determination of whether a duty to inquire arose and/or the third party acted reasonably must be made in light of all the surrounding facts and circumstances. *See Jackson Rapid Delivery Service, Inc. v. Thomson Consumer Electronics, Inc.,* 210 F.Supp.2d 949, 954 (N.D.Ill.2001); *Redex, Inc. v. Melmark Cartage Co.,* 1989 WL 68480 *1 (N.D.Ill. June 16, 1989). *Cf. Shapo v. Underwriters Management Corp.,* 2002 WL 31155059 *12 (N.D.Ill. Sept. 27, 2002) (inherent authority).

Here, it is undisputed that Stirling Cooke actually knew that a premium limit

existed that was possibly subject to being increased. It is undisputed that, in 1997, Stirling Cooke received a copy of the Binding Authority which contained the $2,000,000 ($4,000,000) gross premium limit. It is also undisputed that, in February 1998, Stirling Cooke received an addendum showing the premium limit had been increased to £3,500,000 ($7,000,000). Both the Binding Authority itself and the addendum were acts of Sphere Drake. There is no contention that Stirling Cooke was actually aware of the increase to $12,000,000. Also, it is undisputed that, during the first six months of 1998, Stirling Cooke had brokered all but one of the other retrocessional agreements in which EIU purported to act on behalf of Sphere Drake under the same Binding Authority, and the one it did not broker represented only $81,818 in estimated gross premiums. Thus, Stirling Cooke would have been aware that, prior to the Unicare Retrocession, the estimated gross premiums had already exceeded both $7,000,000 and $12,000,000. Also, it would have been aware that the Unicare Retrocession itself represented at least $9.9 million, which was itself more than the known $7,000,000 limit. Under these circumstances, Stirling Cooke would be obliged to make reasonable inquiry as to whether the premium limit had been increased and whether the limit had been reached. *Cf. General Refrigeration*, 333 N.E.2d at 611–13; *Almerico*, 716 So.2d at 780.

All American cites *American Insurance Co. v. Meyer Steel Drum, Inc.*, 1990 WL 92882 *4 n. 4 (N.D.Ill. June 27, 1990), but that case is distinguishable. There, the insurer had no notice that the insured had set any premium limit as to insurance procured by the insured's agent. Without any notice of there being a possible premium

limit, the insurer did not act unreasonably in failing to inquire as to whether one existed. The present case is different. Here, Stirling Cooke was aware the Binding Authority contained a premium limit that was possibly subject to change, but did not inquire as to whether the limit had been increased or reached even though it was also aware that a number of policies had previously been accepted which already exceeded the known premium limit under the Binding Authority.

 All American contends that Stirling Cooke had no duty to inquire as to whether EIU had exceeded the premium limit because the customary practice in the reinsurance industry is that third parties are not expected to monitor the amount of premium that an agent is writing. Custom and practice in the industry is part of the totality of circumstances to be considered in determining if the third party has acted reasonably and diligently. *See Lincoln Cardinal*, 161 Ill.Dec. 189, 578 N.E.2d at 318. However, where the third party has sufficient indications contrary to the usual custom and practice, the third party does not act reasonably by relying on the usual custom and practice to establish apparent authority. *See id.* at 318–19 (although industry practice was that a residential property manager also had authority to enter into leases with a provider of laundry machines, provider of laundry machines did not reasonably rely on that practice where it was apparent that the property manager was acting in his own self interest). The evidence relied upon by All American would support that, under industry practice, a third party would not be expected to monitor how much premium an agent is writing because the third party would not be privy to the agent's other business.[12] Such a practice, howev-

12. Sphere Drake points to evidence that a broker in Stirling Cooke's situation would, in order to protect its client's interests, make reasonable inquiries to ensure that an agent is acting within its authority. The general rule

er, is irrelevant to the circumstances of this case. This is not a situation where Stirling Cooke was ignorant of the amount of premiums written by EIU because EIU was doing business with other entities. Stirling Cooke itself was involved in transactions with EIU that represented more than $14,000,000 in gross premiums for 1998, not counting the Unicare Retrocession. Thus, without inquiring as to other business in which EIU was engaged, Stirling Cooke was already aware of 1998 business that well exceeded the premium limit of which it had been informed. Also, the Unicare Retrocession itself exceeded the known premium limit. Under these circumstances, Stirling Cooke would have a duty to reasonably and diligently inquire as to whether EIU had authority to accept the Unicare Retrocession.

■■■■ The undisputed evidence shows that Stirling Cooke could not have acted reasonably and diligently in assuming EIU had authority to accept the Unicare Retrocession. All American, however, contends that Stirling Cooke's knowledge of the premium limit and the gross premiums represented by the prior policies cannot be imputed to it because Stirling Cooke was not its agent. Instead, All American contends that, although WEB (an admitted agent of All American) authorized Stirling Cooke to place the Unicare Retrocession on All American's behalf, Stirling Cooke was not acting as WEB's or All American's agent but as a reinsurance intermediary

that brokered a deal between EIU and WEB. A reinsurance intermediary, however, is generally considered to be acting as an agent of the ceding insurer (All American), though whether and for whom the intermediary was an agent may still be a question of fact in a particular case. *See Capitol Indemnity Corp. v. Stewart Smith Intermediaries, Inc.,* 229 Ill.App.3d 119, 171 Ill.Dec. 52, 593 N.E.2d 872, 876 (1992), *appeal denied,* 146 Ill.2d 623, 176 Ill.Dec. 793, 602 N.E.2d 447 (1992); *Philan Insurance Ltd. v. Frank B. Hall & Co.,* 748 F.Supp. 190, 192 n. 2 (S.D.N.Y.1990); Graydon S. Staring, *Law of Reinsurance* §§ 7:4, 7:2[1], 7:3[1] (1993); John L. Baringer, "The Reinsurance Market: The Assuming Reinsurer," *in Reinsurance* 329, 334–35 (Robert W. Strain ed., 1980); Richard S. Bakka, "Claims Management," *in Reinsurance* 546, 550 (Robert W. Strain ed., rev. ed.1997).[13] *Compare* John M. Sheffey, *Reinsurance Intermediaries: Their Relationship to Reinsured and Reinsurer* 16 Forum 922 (1981).[14] Although All American contends there is at least a factual dispute as to whether Stirling Cooke was its agent, All American admits that Stirling Cooke entered into and negotiated the Unicare Retrocession on its behalf and points to no sufficient evidentiary basis for finding that Stirling Cooke was not acting as its agent in the transaction. *Cf. In re Pritchard & Baird, Inc.,* 8 B.R. 265,

is that a reinsurance broker has a duty to exercise the care of a reasonably prudent businessperson on behalf of its client. *See* Graydon S. Staring, *Law of Reinsurance* § 7:3[2] (1993).

13. The one general exception is that the intermediary is generally not considered to be the ceding insurer's agent in regard to holding premium payments. *See Philan,* 748 F.Supp. at 197; Staring, § 7:2[1]; Baringer at 334–35. That is not an issue in the present case.

14. Sheffey acknowledges that case law as of 1981 supported that a reinsurance intermediary is an agent of the reinsurer or reinsured, with some cases and commentators assuming the intermediary is the agent of the reinsured. *See* Sheffey, 16 Forum at 934 & n. 41. Sheffey argues that the general rule should instead be that the intermediary ordinarily should not be considered the agent of either the reinsured or reinsurer.

269–70 (D.N.J.1980), *aff'd by unpublished orders*, 673 F.2d 1299, 1300 (3d Cir.1981); *Wright v. Sullivan Payne Co.*, 839 S.W.2d 250, 253 (Ky.1992). Thus, the evidence only supports that Stirling Cooke was acting as All American's agent and, as discussed above, Stirling Cooke's knowledge precludes finding that apparent authority existed. Moreover, even if Stirling Cooke was not All American's agent, All American would still have the burden of showing that WEB had a basis for assuming apparent authority existed. WEB never received a copy of the Binding Authority and thus, without relying on Stirling Cooke's knowledge, WEB had no acts of Sphere Drake from which it could base a reasonable belief of apparent authority, especially since, as discussed below, WEB had a statutory duty to obtain and retain written evidence of EIU's authority to act on Sphere Drake's behalf.

■ WEB is licensed as a reinsurance intermediary-manager under Connecticut law. *See* Conn. Gen.Stat. §§ 38a–760a(7); 38a–760b. WEB was acting as a reinsurance intermediary-manager for All American. Connecticut law requires that "[f]or at least ten years after expiration of each contract of reinsurance transacted by the reinsurance intermediary-manager, the reinsurance intermediary-manager shall keep a complete record of each transaction showing ... (K) when the reinsurance intermediary-manager places a reinsurance contract on behalf of a ceding insurer ... (ii) if placed through a representative of the assuming reinsurer, other than an employee, written evidence that such reinsurer has delegated binding authority to the representative." *Id.* § 760f(a)(4)(K)(ii). All American contends this statute is inapplicable to the Unicare transaction because

the statute only applies to transactions between a reinsurance intermediary-manager (WEB) and the reinsured (All American). The Unicare Retrocession, however, did involve a transaction between WEB and All American, that is WEB acting on behalf of All American. In such circumstances, where the intermediary-manager (WEB) is placing a reinsurance contract (the Unicare Retrocession) on behalf of a ceding insurer (All American) and doing so through a representative (EIU) of the reinsurer (Sphere Drake), the intermediary-manager (WEB) must maintain complete records, including written evidence that the reinsurer (Sphere Drake) has delegated binding authority to the representative (EIU). Thus, WEB had a statutory obligation to obtain and keep written evidence of the Binding Authority that Sphere Drake had issued to EIU. Had, WEB satisfied that statutory obligation, it would have been aware that the Binding Authority contained a premium limit and would have been on notice to inquire further. It is undisputed that WEB was aware the Unicare Retrocession was entered into with a representative of Sphere Drake and WEB nevertheless obtained no evidence of EIU's authority to act on Sphere Drake's behalf. Had WEB obtained a copy of the Binding Authority from Stirling Cooke, it would have been aware of the premium limit. Had it inquired further, it could have learned from Stirling Cooke [15] that the known $7,000,000 limit had already been exceeded. And even if WEB did not learn of the earlier premiums, WEB would have known that the Unicare Retrocession itself exceeded the known $7,000,000 limit, thus putting it on notice to inquire further. Under these circumstances, it could only be found that WEB acted negligently in failing to per-

---

**15.** WEB was not involved in all the Sphere Drake related transactions in which Stirling Cooke and EIU participated, so its knowledge as to the over $12,000,000 in earlier premiums would have to come from Stirling Cooke.

form its statutory duty and therefore could not rely on apparent authority. *See General Refrigeration,* 333 N.E.2d at 611–13. Thus, even if Stirling Cooke were not considered to be WEB's and All American's agent, there would not be an adequate basis for finding apparent authority existed.

■ All American also contends that apparent authority can be based on EIU accepting prior retrocessions on Sphere Drake's behalf without any protest from Sphere Drake. That, however, assumes that Sphere Drake received prompt and accurate information regarding the acceptance of new retrocessions. Undisputed evidence shows that the most recent bordereau [16] EIU provided to Sphere Drake prior to the Unicare Retrocession was the May 1998 bordereau which indicated EIU was still within the premium limits. There is no evidence that Stirling Cooke had knowledge that Sphere Drake was receiving prompt and accurate information regarding the gross premiums of the retrocessions being accepted. This is in contrast to Stirling Cooke which, in placing the retrocessions, would have had accurate information regarding premiums under the retrocession. Moreover, the evidence indicates that industry practice did not require immediate forwarding of the necessary documents for accurately determining when a retrocession was accepted and the amount of premium involved and All American points to no evidence to the contrary. Additionally, Stirling Cooke never attempted to ascertain whether the premium limit had actually been increased nor whether EIU was approaching the then-existing limit. Just because one policy was being accepted without protest, it did not mean that the next policy to be accepted would still keep EIU within the limit. This was especially true of the Unicare Retrocession's minimum $9,864,917 premium which, by itself, exceeded the previously known premium limit. The lack of a prior protest from Sphere Drake could not be a reasonable basis for assuming the premium limit would not be breached by the Unicare Retrocession, especially when considering that Stirling Cooke had made no attempt to follow up on its prior knowledge that a premium limit existed.

For the foregoing reasons, the undisputed facts show that All American had no sufficient basis for relying on apparent authority. It is unnecessary to also consider whether All American satisfies the detrimental reliance requirement for apparent authority to control.

## VI. RATIFICATION, ESTOPPEL, & WAIVER

There is no dispute that, up to the time of the Unicare Retrocession, EIU was providing reports to Sphere Drake which indicated that the gross premiums for retrocessions accepted by EIU were below the existing premium limit. Because of problems regarding a particular policy, however, in late June and late July 1998, Sphere Drake began audits of the EIU retrocessions. All American contends that, by at least August 5, 1998, Sphere Drake was aware that the premium limit had been exceeded. It further contends that (a) Sphere Drake's continued acceptance of premium payments and (b) Sphere Drake waiting until March 1999 to notify All American that it was rescinding the Unicare Retrocession constitute ratification of the Unicare Retrocession or waiver or estoppel of any right to repudiate the con-

---

**16.** A "bordereau" is "[a] description of reinsured risks; esp., a periodic report provided by a cedent to a treaty reinsurer, consisting of basic information affecting the reinsurance treaty, such as the underlying insureds, the types of risks covered, policies, and dates of loss." *Black's Law Dictionary* 178 (7th ed.1999).

tract. All American also contends that Sphere Drake acted inconsistently with nonacceptance or repudiation by seeking its own reinsurance for the Unicare Retrocession.

■ Where an agent acts without authority in entering into a contract on the principal's behalf, the contract may still be ratified by the principal. *Stathis v. Geldermann, Inc.*, 295 Ill.App.3d 844, 229 Ill. Dec. 809, 692 N.E.2d 798, 808 (1998), *appeal denied*, 179 Ill.2d 620, 235 Ill.Dec. 577, 705 N.E.2d 450 (1998); *Triad Construction Services, Inc.*, 1999 WL 571053 at *9; *Chicago Painters & Decorators Pension, Health & Welfare v. Five Star Commercial & Industrial Painting, Inc.*, 1998 WL 178813 *2 (N.D.Ill. April 10, 1998).

> Ratification occurs when the principal learns of an unauthorized transaction, then retains the benefits of the transaction or takes a position inconsistent with nonaffirmation. *Progress Printing Corp. v. Jane Byrne Political Committee*, 235 Ill.App.3d 292, 310, 176 Ill.Dec. 357, 601 N.E.2d 1055 (1992) (*Progress Printing*). For ratification to occur, the principal must, with full knowledge of the act, manifest an intent to abide and be bound by the transaction. *Peskin v. Deutsch*, 134 Ill.App.3d 48, 55, 89 Ill. Dec. 28, 479 N.E.2d 1034 (1985). Ratification may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction. *Progress Printing*, 235 Ill.App.3d at 310, 176 Ill.Dec. 357, 601 N.E.2d 1055.

*Stathis*, 229 Ill.Dec. 809, 692 N.E.2d at 808. "[R]atification will not be implied ... from acts or conduct which are as consistent with an intention not to ratify as to ratify." *In re Midway Airlines, Inc.*, 180 B.R. 851, 920 (Bankr.N.D.Ill.1995) (quoting *Evanston Bank v. ContiCommodity Services, Inc.*, 623 F.Supp. 1014, 1037 (N.D.Ill. 1985) (quoting *Arthur Rubloff & Co. v.*

*Drovers National Bank of Chicago*, 80 Ill. App.3d 867, 36 Ill.Dec. 194, 400 N.E.2d 614, 618 (1980))); *Williams v. National Housing Exchange, Inc.*, 45 F.Supp.2d 648, 653 (N.D.Ill.1999). The burden is on All American to establish ratification. *Midway*, 180 B.R. at 920.

Growing out of difficulties surrounding a claim known as the "Versace claim," Sphere Drake decided to conduct an investigation of EIU practices. On June 30, 1998, under the direction of Sphere Drake's Bentley, an administrative audit of the EIU underwriting was conducted at Horace Holman. This revealed administrative problems and by mid-July 1998, Sphere Drake had decided to conduct a more thorough audit. On July 28 and 29, 1998, Sphere Drake employees Michael Mather and John Coppinger conducted the audit. They issued a report dated August 5, 1998. In the report, it was concluded that, through June 30, 1998, EIU had written at least $16,683,818 in gross premiums which was specifically identified as being in excess of the £6,000,000 ($12,000,000) premium limit for 1998. The report also indicated that EIU failed to adequately evaluate the risks and value of the retrocessions it accepted. Sphere Drake did not then take any action to rescind any of the retrocessions that may have been entered into in excess of the premium limit nor did it then seek rescission for any other reason. On August 7, 1998, Sphere Drake CEO Watson did inform Whitcombe that EIU needed to stop underwriting because the premium limit had been exceeded. A moratorium on further underwriting had already been put in place effective July 28, 1998.

■ The August 5, 1998 report was not considered to be conclusive. It caused Sphere Drake to conduct further investigation, including into possible collusion between EIU and Stirling Cooke. More di-

rectly related to the excess authority claim and ratification is the undisputed evidence that, as of August 1998, Sphere Drake did not yet have enough information to determine the order in which retrocessions were accepted. Thus, while Sphere Drake could determine, at least preliminarily, that the premium limit had been exceeded, it could not yet determine which retrocessions were the ones accepted when and after the limit was reached. Thus, in August 1998, Sphere Drake was not yet in a position to determine which retrocessions were unauthorized because issued in excess of the premium limit and thus also not in a position to yet rescind particular retrocessions. Sphere Drake's investigation of EIU continued through March 1999 and beyond. It took at least two more months just to determine who had participated in particular retrocession programs. Robert Forness of Sphere Drake testified: "it took [Sphere Drake] at least a couple of months just to identify who had participated in various programs and to arrange visits to speak to them or to schedule audits. I don't believe even by October [1998] we had a full understanding of what had occurred. We were starting to put a picture together, but that's about how I would describe it." The burden is on All American to establish ratification, including when Sphere Drake may have become informed as to material facts. All American does not point to evidence, other than the August 5 report itself, as to when Sphere Drake may have determined the Unicare Retrocession was one of the retrocessions accepted in violation of the premium limit. However, from Forness's testimony, it can be reasonably inferred that such a determination could be made sometime in October 1998. On Sphere Drake's summary judgment motion, that inference will be drawn and taken as true. It, however, is not the only inference that may be drawn. On All American's motion, it must be taken as true that Sphere Drake did not actually have such knowledge until March 1999.

All American also contends that Sphere Drake was at fault for failing to adequately monitor EIU's underwriting. Although the principal's actual knowledge of material facts is generally the pertinent issue regarding ratification, "one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had actual knowledge." *Progress Printing*, 176 Ill. Dec. 357, 601 N.E.2d at 1067–68 (quoting 18 Ill. Law & Prac. *Estoppel* § 23 at 84 (1956)); *In re Ostrom–Martin, Inc.*, 202 B.R. 267, 274 (Bankr.C.D.Ill.1996). Evidence supports that Broad was sloppy and not particularly diligent in monitoring EIU. (Sphere Drake points to contrary evidence that Broad closely examined at least some aspects of the bordereaux provided to him.) However, the bordereaux that EIU provided contained information showing EIU remained below the premium limit. More closely examining the bordereaux would not have revealed that the premium limit had been exceeded. Such a determination would have required obtaining additional documents and conducting a more detailed examination. Events in this case show that a determination that the premium limit had been exceeded required an audit and further investigation was needed to determine which retrocessions were accepted after the limit was reached. The evidence does not support that Sphere Drake would have learned the limit had been exceeded if Broad had performed his duties in a reasonably diligent manner. It certainly does not support that failure to contemporaneously recognize the limit had been exceeded was due to Broad's gross or culpable negligence.

In early December 1998, WEB requested that Sphere Drake provide irrevocable

letters of credit to cover year-end reserve funding requirements under the Unicare Retrocession. At the end of December, Sphere Drake raised issues with Horace Holman going to the requirements of the letters of credit, but also made mention of general issues regarding EIU's actions under the Binding Authority.[17] On January 8, 1999, Sphere Drake sent a fax to Stirling Cooke which stated in part: "To be quite clear, my 'dissatisfaction' relates to the manner in which a binding authority granted by officers of [Sphere Drake] for the purposes of enabling the Coverholder to write a short-tail low to medium risk accident account, has been used to write a book of business which, as far as I can tell, bears no resemblance to that described in the Business Plans and which, quite apart from any of the other concerns which we have raised, seems to consist, in large part, of disastrously underpriced high-risk, long-tail Workers' Compensation business." Sphere Drake Response Exh. 15. Also sent with this fax was a December 31, 1998 fax from Sphere Drake to Horace Holman

stating in part: "As you will know, we are carrying out a review of our involvement in this facility and, whilst this is ongoing, we feel that we have to reserve our position in relation to the [letters of credit] requests and generally." *Id.* Exh. 14. The January 8, 1999 fax also made reference to prior discussions. Evidence is presented showing that a meeting was held on January 4, 1999 that included participants from Sphere Drake, Stirling Cooke, Horace Holman, and EIU.[18] Issues as to claimed deficiencies in EIU's underwriting practices were raised at that meeting and Sphere Drake expressed a desire to be out of all the EIU-accepted retrocessions *ab initio*. The evidence of the meetings that is provided supports that there was no issue raised regarding exceeding the premium limit. One of the file notes, Sphere Drake Reply Exh. 17 at SDA2580, shows that reference was made to the moratorium that was imposed beginning July 1998.

In a February 4, 1999 letter from All American to Sphere Drake, All American expressly acknowledged that an issue had

---

**17.** All American contends that in December 30, 1998 communications with Horace Holman and Stirling Cooke, Sphere Drake addressed the letters of credit issue on its merits without mentioning the general issues, but then Sphere Drake raised the general issues the next day. All American apparently contends the December 30 communications are evidence of Sphere Drake confirming the validity of the Unicare Retrocession. However, the evidence cited by All American shows the December 30 communications also make reference to the general issues. *See* All American Reply Exh. 64 (December 30, 1998 fax from Sphere Drake to Horace Holman) ("[W]e are, as you know, carrying out our own review of the account that has been written and, in doing so, are trying to evaluate the concerns which I have raised with you over the course of the last few months. This is ongoing.... [W]e have started to look through EIU's underwriting files and, although this process will take some time, we are deeply disturbed by what we have seen so far."); *id* at 65 (Bentley's notes of December 30, 1998 con-

versation between Sphere Drake's Bentley and Stirling Cooke's Nick Brown) ("The conversation then turned to some of the previous problems regarding [the EIU] account.... Nick Brown said he was aware that the senior management of [Sphere Drake] were reviewing the cover. He thought that [Sphere Drake's] actions in recent months were unhelpful and he could not understand our attitude. Nick Brown went on to say he knew the facility may not go forward for 1999 but such a decision would be unbelievable. He again reiterated that EIU were doing an excellent job on [Sphere Drake's] behalf. If only we really understood this account instead of asking some of the ridiculous questions,....").

**18.** The evidence consists of written file notes of the meeting that were written by two of the attendees. *See* Sphere Drake Response Exh. 16–17; All American Reply Exh. 69. Neither side objects to the use of these file notes as evidence of the discussions that occurred.

been raised regarding EIU's authority to place business on Sphere Drake's behalf.

On March 31, 1999, Sphere Drake provided written notice to All American that, *ab initio*, it was rescinding the Unicare Retrocession, as well as six other EIU-accepted retrocessions in which All American was the ceding insurer. Sphere Drake offered full return of the premium. The stated grounds were:

> We have been investigating the operation of the binding authority, the contracts written thereunder and EIU's dealings with brokers generally. These investigations have revealed that the placement of each of the Contracts was induced by and is vitiated by fraud on the part of your agents/brokers and EIU. Further, the nature of the Contracts was such that your agents/brokers knew (or ought to have known), when placing the business, that EIU was acting in clear and deliberate breach of the duties owed to [Sphere Drake].

By the end of 1998, Sphere Drake had received through EIU more than $3,000,000 in Unicare Retrocession premiums. The evidence presented by All American does not show when the payments were forwarded to Sphere Drake. *See* All American Exh. 45. Since the burden of proof is on All American, it will not be assumed that any of these payments were made in October 1998 or later. There is no conclusive evidence regarding whether or not, in 1998, Sphere Drake would have been able to identify any of the payments received from EIU as representing Unicare Retrocession premiums.

By late January 1999, Sphere Drake had offered to return all premiums. All American rejected that offer.

It is undisputed that, as late as February 1999, Sphere Drake was seeking its own reinsurance for the retrocessions accepted by EIU. It is also undisputed that Sphere Drake did not expect that they would be able to find such reinsurance. Also, Sphere Drake insisted that disclosures about Sphere Drake's problems with EIU be made to any reinsurer.

Clearly, All American cannot be entitled to summary judgment on the issue of ratification. On All American's motion, it must be taken as true that Sphere Drake did not know until March 1999 that the Unicare Retrocession was one of the retrocessions accepted in violation of the premium limit. Thus, Sphere Drake did not have full knowledge of the material facts until shortly before it gave All American formal notice of rescission. Therefore, on All American's summary judgment motion, Sphere Drake cannot be found to have ratified the Unicare Retrocession.

On Sphere Drake's motion, it must be taken as true that Sphere Drake knew by sometime in October 1998 that the Unicare Retrocession was accepted in violation of the premium limit. Sphere Drake did not provide notice of rescission until more than five months later. However, by early January 1999, Sphere Drake was already informing Stirling Cooke that it was questioning EIU's authority to accept the retrocessions, including the Unicare Retrocession. Even though it can be argued that the communication did not directly raise the excess authority issue, it was an indication of an intent not to affirm the Unicare Retrocession. Moreover, subsequent to October 1998, Sphere Drake was continuing to investigate possible fraud and fiduciary duty violations by EIU, possibly in collusion with Stirling Cooke. Confirmation of those suspicions potentially could have provided grounds for rescinding all the EIU-accepted retrocessions, not just those retrocessions accepted when and after the premium limit was reached.

There is no sufficient evidence that Sphere Drake continued to receive any

premium payments after October 1998. The only evidence of possibly inconsistent conduct is retention of prior payments and the attempt to obtain reinsurance coverage. The attempt to obtain reinsurance was another way of avoiding the contracts and Sphere Drake was insisting that disclosure of the EIU problems be made to any potential reinsurer. Seeking reinsurance was not any more consistent with intending to ratify than it was with intending not to ratify.

As to retention of the premiums, it must be taken as true on Sphere Drake's motion that, by October 1998, Sphere Drake could identify premiums received under the Unicare Retrocession. Sphere Drake first offered to return the premiums in late January 1999 and that offer was rejected by All American. Thus, the evidence, construed in All American's favor, only supports that, prior to offering to return them, Sphere Drake knowingly retained premiums for less than three months after learning the Unicare Retrocession was accepted in violation of the premium limit. Sphere Drake did not receive additional payments; it only continued to retain those it had previously received. Additionally, during those three months, Sphere Drake was also continuing to investigate the EIU-accepted retrocessions, including possible fraud and breaches of fiduciary duty. Throughout the three months, Sphere Drake engaged in discussions with EIU and Stirling Cooke was also included in the discussions beginning no later than January 4, 1999. Ratification does not occur if the principal fails to return prior payments immediately after obtaining full knowledge regarding the unauthorized contracting. *See Schoenberger,* 39 Ill.Dec. 941, 405 N.E.2d at 1082. The principal is only required to take action to repudiate the contract or return benefits within a reasonable period of time after obtaining full knowledge. *Progress Printing,* 176 Ill.

Dec. 357, 601 N.E.2d at 1067; *Mateyka v. Schroeder,* 152 Ill.App.3d 854, 105 Ill.Dec. 771, 504 N.E.2d 1289, 1295 (1987); *Corn Belt Bank v. Lincoln Savings & Loan Association,* 119 Ill.App.3d 238, 74 Ill.Dec. 648, 456 N.E.2d 150, 159 (1983); *Security Insurance Co. of Hartford v. Mato,* 13 Ill.App.3d 11, 298 N.E.2d 725, 729–30 (1973). This includes a reasonable period of time to investigate pertinent facts. *See Neece v. John Hancock Mutual Life Insurance Co.,* 1989 WL 31004 *2 (N.D.Ill. March 24, 1989), *aff'd by unpublished order,* 914 F.2d 260, 1990 WL 135874 (7th Cir.1990); *Southland Corp. v. Mir,* 748 F.Supp. 969, 986 (E.D.N.Y.1990); *Bernstein ex rel. Commissioner of Banking & Insurance of Vt. v. Centaur Insurance Co.,* 644 F.Supp. 1361, 1370 (S.D.N.Y.1986). Also, retaining the benefits will not necessarily constitute ratification if the principal cannot then repudiate the entire contract without incurring a loss. *Corn Belt,* 74 Ill.Dec. 648, 456 N.E.2d at 159.

Here, Sphere Drake's investigation of possible fraud and fiduciary duty violations continued even after it could determine that the Unicare Retrocession was one of the retrocessions accepted in violation of the premium limit. The fraud possibly involved collusion with All American's agents. A reasonable finder of fact could not find that Sphere Drake acted unreasonably by continuing to investigate the fraud for another few months before first offering to return the premiums. The investigation potentially could have revealed liabilities for which retaining the premiums would be an offset. On the evidence before the court, it cannot be found that Sphere Drake failed to act within a reasonable period of time to repudiate the Unicare Retrocession and offer to return the premiums. *Cf. Southland Corp.,* 748 F.Supp. at 986. There is no sufficient basis for finding that Sphere Drake en-

gaged in conduct that ratified the unauthorized contract.

■■■ All American also raises the related defenses of estoppel and waiver. Those defenses fail for reasons identical or similar to the reasons the ratification defense fails. All American bears the burden of proving the elements of estoppel.[19] *Midway*, 180 B.R. at 967. "Estoppel refers to reliance by one party on the word or conduct of another so that the party changes his position and subsequently suffers harm. It arises whenever one by his conduct, affirmative or negative, intentionally or through culpable negligence, induces another to believe and have confidence in certain material facts, and the latter having the right to do so, relies and acts thereon, and is as a reasonable and inevitable consequence, misled to his injury." *Id.* at 971 (quoting *Gary–Wheaton Bank v. Meyer*, 130 Ill.App.3d 87, 85 Ill. Dec. 180, 473 N.E.2d 548, 554–55 (1984)). In order to succeed on its estoppel defense, one element that All American must show is detrimental reliance. *See In re Krueger*, 192 F.3d 733, 741 (7th Cir.1999); *Moriarty v. Hills Funeral Home, Ltd.*, 221 F.Supp.2d 887, 895 (N.D.Ill.2002). All American contends it relied to its detriment on Sphere Drake's delay in not rescinding the contract after Sphere Drake was aware it could rescind based on EIU's violation of the premium limit. The purported detriment was paying the premiums and not seeking alternative cover. However, there is no evidence that further premiums were paid after October 1998. Therefore, the payment of premiums could not have been made in reliance on any delay by Sphere Drake. As to obtaining cover, All American presents no sufficient evidence that, as of October 1998, it could have obtained alternative cover or that its ability to obtain cover decreased between October 1998 and January 1999 when Sphere Drake offered to return premiums and void the contract. Also, even if All American could satisfy the detrimental reliance requirement, the fact that Sphere Drake acted within a reasonable period of time to repudiate and rescind the contract would preclude the application of estoppel. *Cf. ANR Freight System, Inc. v. Weldbend Corp.*, 1993 WL 88086 *4 (N.D.Ill. March 22, 1993). The evidence before the court does not support All American's estoppel defense.

■■■ All American also invokes waiver. Again, the burden of proof to show waiver is on All American. *See Midway*, 180 B.R. at 919.

A waiver is the intentional relinquishment of a known right or such conduct as warrants an inference of such relinquishment. To constitute a waiver, it is essential that there be [1] an existing right, benefit or advantage, [2] knowledge, actual or constructive, of its existence, [3] an intention to relinquish it, and [4] an indication of the intention to relinquish the right by some act.

Waiver may be express or implied, as a necessary consequence of conduct inconsistent with an assertion of the retention of a right.

18 Ill. Law & Prac. *Estoppel* § 21 at 78 (1956).

■■■ In order to establish implied waiver through a party's conduct, it must be shown that the party "clearly, unequivocally, and decisively" took action waiving the right. *Midway*, 180 B.R. at 920. "Waiver of a contractual right is shown only when a party conducts itself in a manner which is wholly inconsistent with the clause or con-

---

**19.** The standard of proof may be one higher than preponderance of the evidence. *See Midway*, 180 B.R. at 968–71. For present purposes, though, it may be assumed that the preponderance of the evidence standard applies.

dition, thereby indicating its intent to abandon the contractual right." *Id.*

 Here, Sphere Drake did not engage in any conduct that unequivocally indicated an intent to waive its right to repudiate an unauthorized contract. Like ratification, waiver cannot occur until the waiving party first has knowledge of its right. Sphere Drake did not know of its ability to rescind the Unicare Retrocession until October 1998 at the earliest. It thereafter continued to investigate related issues for approximately two months before expressing an intention to repudiate the contract and less than a month later offered to return the benefits it had previously received and had continued to retain. As previously discussed, Sphere Drake acted in a reasonable and timely manner. That does not constitute conduct clearly, unequivocally, and decisively indicating an intent to waive the right to repudiate the contract. The evidence before the court does not support All American's waiver defense.

## VII. CONCLUSION

All American does not present sufficient evidence to support any basis for finding that Sphere Drake was bound by the Unicare Retrocession. Sphere Drake's summary judgment motion will be granted and All American's summary judgment motion will be denied. Since Sphere Drake was not bound by the Unicare Retrocession, there is no basis for requiring it to arbitrate any dispute and All American's pending motion to compel arbitration will be denied as well. *Sphere Drake II,* 256 F.3d at 592; *Sphere Drake IV,* 221 F.Supp.2d at 878. Because the excess authority claim is resolved in Sphere Drake's favor, there is no need to further consider the fiduciary duty claim which will be dismissed without prejudice. *Sphere Drake II,* 221 F.Supp.2d at 878–79. Sphere Drake is entitled to a declaratory judgment that the Unicare Retrocession was void *ab initio.*

It will be required to return the Unicare Retrocession premiums paid by All American. All American's counterclaim causes of action will be dismissed with prejudice.

IT IS THEREFORE ORDERED that plaintiff's motions to strike [148, 162] are granted in part and denied in part. Plaintiff's motion for summary judgment [134] is granted. Defendant's motions for summary judgment [140] and to compel arbitration [101] are denied. The Clerk of the Court is directed to enter judgment in favor of plaintiff-counterdefendant Sphere Drake Insurance Limited (f/k/a Odyssey Re (London) Limited) and against defendant-counterplaintiff All American Life Insurance Company (n/k/a American General Life Insurance Company) (a) declaring that the Unicare Retrocession (Registration No. AH 0115198) is void *ab initio;* (b) ordering that Sphere Drake return the Unicare Retrocession premiums received by Sphere Drake within 30 days after this judgment becomes final; (c) dismissing plaintiff's Count II and Count III "fiduciary duty claims" without prejudice; and (d) denying counterdefendant's counterclaim causes of action with prejudice.